[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 14, 2002
THOMAS K. KAHN
CLERK

————————————————

No. 02-10898

————————————————

D.C. Docket No. 00-00294 CV-HLM-4

TERRI VINYARD,

Plaintiff-Appellant,

versus

STEVE WILSON,
Sheriff of Walker County, Georgia,
PATRICK STANFIELD,

Defendants-Appellees,

STEVE DIXSON,

Defendant.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

**(November 14, 2002)**

Before HULL, WILSON and FAY, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Terri Vinyard appeals from the district court's grant of summary judgment (1) to defendant Officer Patrick Stanfield individually on her § 1983 claim for excessive force during her arrest, and (2) to defendant Sheriff Steve Wilson individually on her fraud and § 1983 claims for failure to investigate her excessive force complaint. After review and oral argument, we conclude Sheriff Wilson was entitled to qualified immunity but Officer Stanfield was not. Thus, we affirm as to Sheriff Wilson but reverse as to Officer Stanfield.

## I. FACTUAL BACKGROUND

### A. The Arrest

On or about October 4, 1998, Plaintiff Vinyard and some friends had a cookout at the home of Vinyard's boyfriend in Lafayette, Georgia. Vinyard admits to consuming four to five beers over the course of the evening. She contends, however, that she was "not highly intoxicated," but only "somewhat tipsy" or "had a buzz." At some point during the evening, Officer Stanfield stopped by the party. Stanfield was a deputy in the Road Patrol Division of the Sheriff's Office of Walker County, Georgia.

Stanfield advised Vinyard and her friends that James Steele, a neighbor, had complained that Vinyard's son had provided beer to Steele's son. Stanfield

instructed Vinyard and her friends not to provide alcohol to Steele's son. Stanfield also told Vinyard to stay away from Steele.

After Stanfield left, Vinyard and two friends walked down the street to retrieve Vinyard's son, who was visiting another neighbor. After picking up her son, Vinyard and her friends began walking back to the party. On the way back to the party, the group passed Steele's residence. Vinyard contends that Steele made a comment to her and that the two engaged in a verbal confrontation. Vinyard, her son, and her friends then returned to the party.

Subsequently, Stanfield stopped again at the party and asked Vinyard if she had been to Steele's residence. Vinyard attempted to explain that she had passed Steele's residence when she went to retrieve her son. Stanfield, who appeared agitated and angry, responded that he "didn't want to hear it" and informed Vinyard that she was under arrest for going to Steele's residence.

Vinyard again attempted to explain why she had passed Steele's residence. Officer Stanfield then told Vinyard to get up from her chair. Before she could rise, however, he grabbed her arm and jerked her out of her chair. Officer Stanfield then handcuffed Vinyard behind her back, placed her in the back seat of his patrol

3

car, and began to drive her to the Walker County jail. Stanfield's patrol car had a glass or plexiglass screen between the front and back seat.[1]

## B. Ride to the Jail

During the drive to the jail, Officer Stanfield and Vinyard exchanged verbal insults while he drove and she remained handcuffed in the back seat. According to Vinyard, Stanfield eventually informed her that "[y]ou're a drunk, always have been, and always will be. You are one drunken, skanky whore." Stanfield then told Vinyard that she did not deserve her children, and that Stanfield also was "not worried about [Vinyard's] fucking bastard son."[2] After these remarks, Vinyard

---

[1]We recite the facts in the light most favorable to Plaintiff Vinyard. See Hinson v. Edmond, 192 F.3d 1342, 1348 (11th Cir. 1999), amended by, 205 F.3d 1264 (11th Cir. 2000); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). However, Officer Stanfield hotly disputes her version of the events. Stanfield contends that he visited the party the second time to speak with Vinyard about going to Steele's property, that Vinyard verbally berated and cursed him, and that Vinyard refused to remain quiet long enough for Stanfield to speak to the group about the confrontation at Steele's house. Stanfield's incident report indicates that while attempting to take her into custody, Vinyard started trying to fight with him in an attempt to avoid arrest, and she stated that she was not going to go to jail. According to Stanfield, Vinyard was placed under arrest for disorderly conduct and obstruction of a law enforcement officer.

[2]Vinyard testified that it was difficult to hear "with the glass on there" whether Stanfield had any radio contact with anyone during the trip to the jail. However, she did not testify that she had difficulty hearing any of Stanfield's verbal insults.

4

cursed Stanfield. Vinyard admits that she "got mad" and "started screaming" at Stanfield.

About one-fourth or one-half mile from the party and during Vinyard's verbal tirade, Officer Stanfield pulled his patrol car to the side of the dark, secluded road, stopped the car, got out, and stepped back to Vinyard's door and opened the door. Vinyard was scared and "did not know what Stanfield was going to do." Vinyard saw that Stanfield had something in his hand when he opened the door, and she ducked to the right. According to Vinyard, Stanfield grabbed Vinyard's arm, bruising her arm and breast. He then apparently let go of her arm, pulled Vinyard's head back by her hair and sprayed her in the face with two to three bursts of pepper spray.[3] At all times Vinyard remained in the back seat and handcuffed behind her back with her feet on the floorboard. Vinyard is five foot,

---

[3]Although admitting to spraying Vinyard with one burst of pepper spray, Stanfield testified that, in addition to being verbally abusive, Vinyard kicked the back seat of the patrol car and the rear passenger window, and that she beat her head against the driver side rear window. Additionally, Stanfield contends that Vinyard told him that she was going to get out of the car and was not going to jail. Stanfield testified that he stopped the car to place Vinyard under control and place a seat belt on her, and that she also attempted to kick him and spit on him. Stanfield also stated that he reported via radio that he was having trouble controlling Vinyard and that he was stopping his patrol car to place her under control. Attached to Stanfield's affidavit is a log of his radio transmissions to 911. See notes 9 and 13 infra.

three inches tall and weighed 130 pounds; Stanfield is more than six feet tall and weighed more than 200 pounds. There were no witnesses to the incident.[4]

After bruising and pepper spraying Vinyard, Officer Stanfield then resumed driving Vinyard to the jail. According to Vinyard, the trip to the jail from the party was approximately four miles. When Vinyard complained that she could not breathe, Stanfield said, "I hope you die, because when I get you to the jail I'm going to beat the shit out of you and there's nothing you can do." When Stanfield and Vinyard arrived at the jail, Stanfield dragged Vinyard inside, either by her shirt, her arm or her hair. Two female officers escorted Vinyard to the shower to wash off the pepper spray. Vinyard admits that she may have become "a little rowdy" with the two female officers during the booking process, but she contends that she did not "fight" with them. Vinyard claims that after the arrest she missed a couple of days of work, and that the cause of her illness may have been the pepper spray.

---

[4]During the trip to the jail, Trooper Joe Massingill of the Georgia State Police heard Stanfield radio the jail that he was stopping the patrol car because Vinyard was kicking the rear window. Massingill turned his car around and went to Stanfield's location. However, when Massingill arrived, Stanfield already was putting away his pepper spray. Massingill asked if he needed to follow Stanfield's car to the jail, but Stanfield declined.

In addition, Trooper Massingill arrived at the party location just after Officer Stanfield, but Vinyard was already in the back of the patrol car. Trooper Massingill gave Vinyard's son a breathalyzer test, but did not have contact with Vinyard. Trooper Massingill left the arrest scene before Stanfield.

Officer Stanfield ultimately charged Vinyard with disorderly conduct and obstructing a law enforcement officer. Vinyard subsequently pled guilty to the obstruction charge as part of a plea agreement that disposed of the criminal charges against her.

## C. Vinyard Complains

The day after her arrest, Vinyard was released from jail on bond. The following day, she and her employer went to the Sheriff's Office of Walker County and filed a misconduct complaint against Officer Stanfield. Defendant Sheriff Wilson is the Sheriff of Walker County, Georgia. At the Sheriff's Office, Officer Steve Dixson met with Vinyard and accepted her complaint. According to Vinyard, she was led to believe that an investigation would ensue. Vinyard thus took no further action against Stanfield, either by filing criminal charges or by filing a civil action.

In late January 1999, a news reporter contacted Vinyard and her mother, Linda Sue Collier, because he had received a call from a deputy or deputies at the jail who were upset about the physical and verbal abuse that Vinyard received the night of her arrest. Later, the reporter conducted an on-camera interview with Vinyard. After that interview, the reporter informed Vinyard that there was no formal complaint on file concerning her arrest. The news reporter also contacted

7

Sheriff Wilson, who then called Vinyard and questioned her about the circumstances surrounding the filing of her first complaint. In his affidavit, Sheriff Wilson stated that he was unaware that Vinyard had filed a complaint in October 1998 or that an investigation had taken place.

On or about February 8, 1999, Vinyard went to see Sheriff Wilson personally and provided him with a copy of her previously filed complaint. Major Wayne Sturdivan, also of the Sheriff's Office, was present at the meeting. Soon after the meeting with Vinyard, Sheriff Wilson informed Vinyard by telephone that her original complaint had been located, and that Major Sturdivan had reviewed the original complaint back in October 1998 and had concluded that the facts supported Stanfield's actions. Nevertheless, Sheriff Wilson instructed Major Sturdivan to conduct another investigation into the allegations in Vinyard's complaint.

In February 1999, Major Sturdivan conducted the second investigation of Vinyard's allegations, interviewing several witnesses. At the conclusion of Major Sturdivan's investigation, Sheriff Wilson reviewed the investigation file compiled by Major Sturdivan and the policies and procedures of his office regarding the

proper use of pepper spray.[5]  After this review, Sheriff Wilson concluded that

Officer Stanfield had not engaged in any wrongdoing with respect to Vinyard's

arrest, including his use of pepper spray.

## II. PROCEDURAL HISTORY

In October 2000, Vinyard filed this lawsuit alleging: (1) a § 1983 claim

against Officer Stanfield individually for excessive force, in violation of the Fourth

Amendment; (2) a § 1983 due process claim against Sheriff Wilson individually

for failure to investigate her complaint; and (3) a fraud claim under Georgia law

against Sheriff Wilson individually.[6]

---

[5]Stanfield contends that he used pepper spray to subdue Vinyard long
enough to safely transport her to the jail and that he used it in conformance with
the policies and procedures of the Sheriff's Office.  These policies and procedures,
however, are not in the record.  Further, at oral argument, Vinyard's counsel stated
that two employees of Sheriff Wilson testified in their depositions that they would
not have employed pepper spray on a handcuffed suspect being transported to jail
in the back seat of a patrol car who was not causing trouble or failing to cooperate
and that the use of pepper spray would be inappropriate even if Vinyard had been
flailing around in the back seat.  These depositions, however, are also not in the
record.  Vinyard's brief also references the deposition of Deputy Phyllis Barfield
who reportedly testified that Officer Stanfield was rough, but that deposition is not
in evidence.  The docket sheet from the district court lists only one deposition
being filed, which was the deposition of Terri Vinyard filed on November 13,
2001. Thus, we do not consider these matters not in evidence.

[6]Vinyard also brought various claims against Officer Dixson and an assault
and battery claim under Georgia law against Officer Stanfield.  These claims were
dismissed by the district court and are not involved in this appeal.  In addition,
Vinyard's complaint contained a § 1983 claim against Sheriff Wilson individually

Following discovery, defendants Sheriff Wilson and Officer Stanfield filed motions for summary judgment, which the district court granted. As to Stanfield, the district court concluded that even if Vinyard's allegations stated a § 1983 claim for excessive force in violation of the Fourth Amendment, Stanfield was entitled to qualified immunity. As to Sheriff Wilson, the court concluded (1) that Vinyard had not shown a due process violation under § 1983 for failure to investigate her complaint, but that Sheriff Wilson would be entitled to qualified immunity in any event; and (2) that Vinyard was unable to show that Sheriff Wilson made false representations as to the investigation or that she suffered any damage as a result of any failure to investigate her complaint. Vinyard timely appeals.[7]

## III. EXCESSIVE FORCE CLAIM

### A. Qualified Immunity

---

for failure to train, supervise and discipline Stanfield but that claim was abandoned in the district court and is also not involved in this appeal.

[7]This Court reviews <u>de novo</u> an order granting summary judgment. <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1190 (11th Cir. 2002). Summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court considering a motion for summary judgment must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in the light most favorable to the party opposing the motion. <u>Id.</u> at 323.

Pursuant to 42 U.S.C. § 1983 (1994), Vinyard sued Officer Stanfield individually for use of excessive force in violation of her constitutional rights under the Fourth Amendment. Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). An officer will be entitled to qualified immunity if his actions were objectively reasonable, that is if an objectively reasonable officer in the same situation could have believed that the force used was not excessive. Anderson v. Creighton, 483 U.S. 635, 638-41 (1987). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. (internal quotation marks omitted). Here, it is clear that Officer Stanfield was acting within the course and scope of his discretionary authority when he arrested Vinyard and transported her to jail.

11

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, -- U.S.-- , 122 S. Ct. 2508, 2513, 153 L. Ed. 2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).[8] If a constitutional right would have been violated under the plaintiff's version of the facts, "the next, sequential step is to ask whether the right was clearly established." Saucier, 533 U.S. at 201; see also Lee, 284 F.3d at 1194. Thus, we first analyze whether Officer Stanfield's conduct, especially his pepper spray use during the jail ride, violated Vinyard's constitutional rights.

## B. Constitutional Violation

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197 (citing Graham v. Connor, 490 U.S.

---

[8]In Saucier, the Supreme Court similarly stated: "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." 533 U.S. at 201.

386, 394-95 (1989)).  The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer.  Graham, 490 U.S. at 396; Lee, 284 F.3d at 1197 (stating that "to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand") (internal quotation marks omitted).  "Use of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396), modified, 14 F.3d 583 (11th Cir. 1994).

As we recently emphasized in Lee, "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'"  284 F.3d at 1197 (quoting Graham, 490 U.S. at 396, and citing Terry v. Ohio, 392 U.S. 1, 22-27 (1968)).  While some force in effecting an arrest is thus allowed, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against

the countervailing governmental interests at stake." Lee, 284 F.3d at 1197-98 (internal quotation marks omitted).

To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; see also Lee, 284 F.3d at 1197-988 (citing Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986) and stating that "in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted") (footnote omitted). As this Court also recently explained in Lee, "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." 284 F.3d at 1198.

All the Graham factors weigh heavily in Vinyard's favor as to the force during the jail ride. First, her crimes, disorderly conduct and obstruction, were of minor severity. Generally, "more force is appropriate for a more serious offense and less force is appropriate for a less serious one." Lee, 284 F.3d at 1198.

14

Second, Vinyard was not posing a threat to the safety of Officer Stanfield or others, much less an immediate threat. Although she was screaming and using foul language in the patrol car, Vinyard contends that Stanfield also was verbally insulting her, which we must take as true. Thus, Vinyard's conduct, as she describes it, was a nuisance but not a threat to Stanfield, herself or others.[9] Third, under Vinyard's account, there is no indication that she actively resisted the initial arrest or attempted to flee at any time. Moreover, at the time of the force during the jail ride, Vinyard was under arrest and secured with handcuffs and in the back seat of the patrol car.

While the parties do not cite and we have not located Supreme Court, Eleventh Circuit, or Georgia Supreme Court decisions regarding pepper spray use in the course of an arrest, other courts have addressed its use.[10] Courts have

---

[9]According to Stanfield, Vinyard kicked at the back seat of the patrol car, kicked a window, and beat her head against a window presenting a safety risk to herself. She also tried to kick him. See note 3 supra. Under Stanfield's version of the facts, Vinyard was physically aggressive, and Stanfield's force was clearly not excessive during the jail ride.

[10]There are two Eleventh Circuit decisions in which a plaintiff arrestee is sprayed with pepper spray, but they did not analyze whether the use of the pepper spray constituted excessive force in those cases. See Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002); Jones v. Cannon, 174 F.3d 1271 (11th Cir. 1999). There is a Georgia Supreme Court decision in which an officer sprayed a citizen with pepper spray in the course of an arrest, but that decision also does not analyze whether the use of pepper spray constituted excessive force. See Dudley v. State,

consistently concluded that using pepper spray is excessive force in cases where

the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting

violently, and there is no threat to the officers or anyone else.[11]  Courts have

consistently concluded that using pepper spray is reasonable, however, where the

plaintiff was either resisting arrest or refusing police requests, such as requests to

enter a patrol car or go to the hospital.[12]   Furthermore, "'as a means of imposing

force, pepper spray is generally of limited intrusiveness,' and it is 'designed to

disable a suspect without causing permanent physical injury.'"  Gainor v. Douglas

County, 59 F. Supp. 2d 1259, 1287 (N.D. Ga. 1998) (quoting Griffin v. City of

---

273 Ga. 466, 542 S.E.2d 99 (2001).

[11]See, e.g., Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1129-30 (9th Cir. 2002), cert. denied sub nom. County of Humboldt v. Burton, 70 USLW 3758 (U.S. Nov. 4, 2002) (No. 01-1744); Park v. Shiflett, 250 F.3d 843, 852-53 (4th Cir. 2001); LaLonde v. County of Riverside, 204 F.3d 947, 961 (9th Cir. 2000); Adams v. Metiva, 31 F.3d 375, 386 (6th Cir. 1994). Although we cite and examine other circuits' and district courts' decisions under the first prong of Saucier, we point out that these decisions are immaterial to whether the law was "clearly established" in this circuit for the second prong of Saucier.  See also note 22 infra.

[12]See, e.g., Jackson v. City of Bremerton, 268 F.3d 646, 652-53 (9th Cir. 2001); Wagner v. Bay City, 227 F.3d 316, 324 (5th Cir. 2000); Monday v. Oullette, 118 F.3d 1099, 1104-05 (6th Cir. 1997); Ludwig v. Anderson, 54 F.3d 465, 471 (8th Cir. 1995); Fernandez v. City of Cooper City, 207 F. Supp. 2d 1371, 1380 (S.D. Fla. 2002); Gainor v. Douglas County, 59 F. Supp. 2d 1259, 1287-88 (N.D. Ga. 1998); Griffin v. City of Clanton, 932 F. Supp. 1359, 1369 (M.D. Ala. 1996).

Clanton, 932 F. Supp. 1359, 1369 (M.D. Ala. 1996)).  Indeed, pepper spray is a

very reasonable alternative to escalating a physical struggle with an arrestee.

Based on Vinyard's account of the facts, it is abundantly clear to us that

during the jail ride Stanfield "used force that was plainly excessive, wholly

unnecessary, and, indeed, grossly disproportionate under Graham." Lee, 284 F.3d

at 1198.[13]  Vinyard was under arrest for offenses of minor severity, handcuffed,

_____

[13]Vinyard also claims that Stanfield's actions prior to handcuffing Vinyard at the arrest scene and upon her arrival at the jail constituted excessive force.  We disagree and conclude that Stanfield's force used and any injury sustained at those two points were de minimis and not excessive.  See decisions where force and injury were held to be de minimis and not excessive, Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (grabbed plaintiff and shoved him a few feet against vehicle, pushed knee in back and head against van, and handcuffed him); Gold v. City of Miami, 121 F.3d 1442, 1444 (11th Cir. 1997) (handcuffed too tightly and too long); Jones v. City of Dothan, 121 F.3d 1456, 1458 (11th Cir. 1997) (slammed plaintiff against the wall, kicked his legs apart and required plaintiff to raise hands above head as officers carried out arrest); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556 (11th Cir. 1993) (pushed plaintiff against wall while handcuffed), modified, 14 F.3d 583 (11th Cir. 1994); see also Lee, 284 F.3d at 1199-1200 (discussing these de minimis force cases).  In Saucier, the Supreme Court approved again the observation that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." 533 U.S. at 209 (internal quotation marks omitted).  Thus, under the first prong of Saucier, we affirm the district court's grant of summary judgment in favor of Stanfield as to Vinyard's claims of excessive force at the arrest scene and at the jail.
    A strong argument exists that even Stanfield's grabbing of Vinyard and the minor bruising during the jail ride constitute de minimis force and injury in the same way as in Nolin, 207 F.3d at 1258 n.4.  What distinguishes Stanfield's force during the jail ride from the de minimis force and injury cases is the use of pepper spray.

17

secured in the back of a patrol car, and posing no threat to Officer Stanfield, herself or the public. In addition, the jail ride was four miles and relatively short. There also was a glass or plastic partition between Stanfield and Vinyard.[14]

Because all of the Graham factors weigh so heavily and obviously in favor of Vinyard, and given the other factual circumstances involved, we conclude that Officer Stanfield's stopping his patrol car during this short four-mile ride, grabbing the arrested, secured and handcuffed Vinyard forcibly enough to bruise her arm and breast and then using pepper spray plainly constituted unreasonable and excessive force in violation of Vinyard's constitutional rights under the Fourth Amendment.[15]

---

[14]The border between permissible and excessive force is marked by a fact-intensive test conducted case-by-case. An excessive force analysis thus requires careful attention to the facts and circumstances of each particular case. Graham, 490 U.S. at 396-97.

[15]Although we have discussed pepper spray cases in the Fourth Amendment context of an arrest, we do not discuss the use of pepper spray in the prison setting because the Eighth Amendment controls such cases, and force does not amount to a constitutional violation in that setting if it is applied in a good faith effort to restore discipline and order and not "maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (internal quotation marks omitted). Moreover, a subjective element was added to certain Eighth Amendment claims in the prison setting in Farmer v. Brennan, 511 U.S. 825 (1994). Thus, the Eighth Amendment standard necessarily involves a more culpable and subjective mental state than that required for excessive force claims arising under the Fourth Amendment's unreasonable seizures restriction. Graham, 490 U.S. at 398.

## C. "Clearly Established" Law

Because Officer Stanfield's conduct violated a constitutional right, the next question is whether that constitutional right was "clearly established" at the time of the violation. In Saucier, the Supreme Court emphasized that determining whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." 533 U.S. at 201; Lee, 284 F.3d at 1194 (quoting Saucier and stating "[t]his second inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition'"); see also Marsh v. Butler County, 268 F.3d 1014, 1031-33 (11th Cir. 2001) (en banc). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (emphasis added).[16] Saucier further instructs that "[i]f the law did not put the

_____

[16]Saucier further emphasized:
The qualified immunity inquiry . . . has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

19

officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. (emphasis added).

Shortly after Saucier, the Supreme Court reiterated in Hope v. Pelzer that "the salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, -- U.S.-- , 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002) (emphasis added). As in Saucier, Hope repeated that officers sued in a § 1983 civil action have a "right to fair notice." Id. at 2515 (emphasis added).

Prior to Hope, this Court en banc in Marsh likewise emphasized that "fair and clear notice to government officials is the cornerstone of qualified immunity." Marsh, 268 F.3d at 1031 (emphasis added). Moreover, the Supreme Court in Saucier and Hope, as well as this Court en banc in Marsh, explained that such fair and clear notice can be given in various ways. For background, see Marsh, 268 F.3d at 1031-32, n.9.

First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified

_____

533 U.S. at 205.

20

immunity, even in the <u>total absence of case law</u>.[17]  This kind of case is one kind of "obvious clarity" case.  For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.[18]

---

[17]<u>See</u> <u>Lassiter v. Alabama A&M Univ.</u>, 28 F.3d 1146, 1150 n.4 (11th Cir. 1994) (<u>en banc</u>) (stating that "[w]e leave open the possibility that occasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity <u>even in the absence of case law</u>.") (emphasis added). <u>See</u> note 18 <u>infra</u>.

[18]In excessive force cases in the Fourth Amendment context, this Court has sometimes considered "obvious clarity" cases as involving conduct "far beyond the hazy border between excessive and acceptable force."  Our "hazy border" decisions concluded the law was clearly established that the force involved was excessive in the absence of any case law (first type of "obvious clarity" notice). <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 927 (11th Cir. 2000) (concluding law was clearly established and force was "clearly-excessive-even-in-absence-of-case-law" when officer released police dog to attack plaintiff who was lying on the ground, did not pose a threat to officers or to anyone else, and was not attempting to flee or resist arrest); <u>Slicker v. Jackson</u>, 215 F.3d 1225, 1233 (11th Cir. 2000) (concluding, without case law on point, that the evidence, if credited, suggested "the officers used excessive force in beating Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way"); <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (concluding officer's conduct was "far beyond the hazy border" and unlawfulness was "readily apparent even without clarifying caselaw" when officer, while on plaintiff's back and handcuffing him, broke plaintiff's arm requiring surgery for multiple fractures even though plaintiff at the time was offering no resistance at all); <u>see</u> <u>also</u> <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1199 (11th Cir. 2002) (concluding "[a]s in <u>Slicker</u>, <u>Priester</u>, and <u>Smith</u>, the peculiar facts of this case are 'so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without caselaw on point.'") (quoting <u>Smith</u>, 127 F.3d at 1419).

21

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then turn to case law. When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. See Marsh, 268 F.3d at 1031-32 n.9. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional without tying that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation.[19] These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances.[20] These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are

_____

[19]We generally accept that the smaller the number of material facts in an opinion, the wider will be the legal principle it decides.

[20]See United States v. Lanier, 520 U.S. 259, 271 (1997) (stating in some instances "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful") (internal quotation marks omitted) (emphasis added); Hope, 122 S. Ct. at 2516 (stating "Lanier thus makes clear that officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances"); Marsh, 268 F.3d at 1031-32 n.9.

22

often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.[21]

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent <u>that is tied to the facts</u>. That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court[22] has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category. When we have written of the circumstances of two cases as being materially different, we are saying the same thing for which the Supreme Court –

---

[21]So, many broad principles of law in the Fourth Amendment context remain insufficient to give fair notice or warning. For example, <u>see</u> <u>Jones v. City of Dothan</u>, 121 F.3d 1456, 1460 (11th Cir. 1997) (concluding broad principle "that use of excessive force by a law enforcement officer is a constitutional violation" was insufficient to clearly establish the law); <u>see</u> note 26 <u>infra</u>.

[22]As stated in <u>Marsh v. Butler County</u>, 268 F.3d 1014, 1032-33 n.10 (11th Cir. 2001) (<u>en banc</u>), "[w]hen case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state."

23

and sometimes this Court – has used a different phrase: "distinguishable in a fair way," in Saucier, 533 U.S. at 202,[23] and "fairly distinguishable," in Pace v. Capobianco, 283 F.3d 1275, 1283 (11th Cir. 2002); see also Marsh, 268 F.3d at 1032-33. When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

For the first and second type of notice or warning, Hope instructs that "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." 122 S. Ct. at 2516. Instead, in the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when the preexisting general constitutional rule applies "with obvious clarity to the

_____

[23]In Saucier, the Supreme Court stated:
Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.
533 U.S. at 202-03 (emphasis added).

24

specific conduct in question," and it must have been "obvious" to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time.  Id. (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)).  In elaborating particularly about the second type of notice or warning (i.e., this second kind of "obvious clarity" case), the Supreme Court in Hope quoted from its earlier decision in Lanier:

> In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary.  But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful," Anderson, supra, at 640, 107 S. Ct. 3034.  Id., at 270-271, 117 S.Ct. 1219 (citation omitted).

Hope, 122 S. Ct. at 2516 (alteration in original) (emphasis added) (quoting Lanier, 520 U.S. 270-71).  Prior to Hope, this Court en banc in Marsh likewise expressly explained that "preexisting case law, tied to the precise facts," is not always essential and that some "general statements of law" may give "fair and clear warning" in some circumstances:

> We acknowledge that preexisting case law, tied to the precise facts, is not in every situation essential to establish clearly the law applying to the circumstances facing a public official so that a reasonable official would be put on fair and clear notice that specific conduct would be unlawful in the faced, specific circumstances.  . . .

25

> Some general statements of law are capable of giving fair and clear warning in some circumstances: the occasional "obvious clarity" cases per Lanier.

Marsh, 268 F.3d at 1031 n.9 (emphasis added).

For the third type of notice or warning, the Supreme Court in Hope explained that "[i]n some circumstances . . . a very high degree of prior factual particularity may be necessary." 122 S. Ct. at 2516 (quoting Lanier, 520 U.S. at 270-71). Indeed, Hope also reaffirmed the well-established rule that for a constitutional right to be clearly established, "its contours 'must be sufficiently clear'" and "in the light of pre-existing law the unlawfulness must be apparent," stating:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell [v. Forsyth, 472 U.S. 511,] 535, n.12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent. Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

Id. at 2515 (alteration in original) (internal quotation marks omitted).[24]

---

[24]Throughout this opinion, we discuss not only Hope but also the Supreme Court's qualified immunity decisions in Saucier, Lanier, and Anderson. We must do so because Hope does not purport to overrule, modify, or even question anything the Supreme Court had earlier said about qualified immunity. The Supreme Court decisions preceding Hope are still good law.

26

Before analyzing whether Stanfield was fairly and clearly warned that his conduct was unconstitutional, it is helpful to review how such notice or warning was given to the officials in <u>Hope</u> and <u>Marsh</u>.

**D. Preexisting Case Law Gave Notice in <u>Hope</u> and <u>Marsh</u>**

In both <u>Hope</u> and <u>Marsh</u>, qualified immunity was denied because preexisting case law clearly established that the jail conditions at issue violated the Eighth Amendment. In <u>Marsh</u>, this Court en banc concluded that three prior cases, including <u>Gates v. Collier</u>, 501 F.2d 1291 (5th Cir. 1974), gave fair and clear notice to the government officials:

> We accept that at least three of our decisions did clearly establish, at the pertinent time, that the conditions of confinement Plaintiffs allege did pose a substantial risk of serious harm to inmates. <u>See</u> <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579 (11th Cir. 1995); <u>Williams v. Edwards</u>, 547 F.2d 1206 (5th Cir. 1977); <u>Gates v. Collier</u>, 501 F.2d 1291 (5th Cir. 1974). These cases contained facts on the conditions of confinement very similar to the facts alleged in this case on the conditions of confinement.
>
> It is true that each of these earlier cases also had, as part of the facts, that the pertinent institution had a history of inmate assaults with serious injuries. And this case lacks that alleged fact. But that factual variance cannot make a difference.

<u>Marsh</u>, 268 F.3d at 1033-34 (internal footnotes omitted).[25] In <u>Marsh</u>, we thus acknowledged that not every factual difference between cases is a material

_____

[25]Before the critical events in <u>Marsh</u>, the Supreme Court had decided that actual injury was not essential to an Eighth Amendment violation. The fact of a prior actual injury, therefore, was no longer material to a violation.

difference: a difference that makes the precedents incapable of giving fair notice to the defendant government official.

In the same vein, the Supreme Court in <u>Hope</u> concluded that our own binding precedent in <u>Gates v. Collier</u>, gave the defendants fair warning that their conduct violated the Constitution:

> Cases decided by the Court of Appeals for the Fifth Circuit before 1981 are binding precedent in the Eleventh Circuit today. <u>See</u> <u>Bonner v. Prichard</u>, 661 F.2d 1206 (C.A.11 1981). In one of those cases, decided in 1974, the Court of Appeals reviewed a District Court decision finding a number of constitutional violations in the administration of Mississippi's prisons. <u>Gates v. Collier</u>, 501 F.2d 1291. That opinion <u>squarely held</u> that several of those "forms of corporal punishment run afoul of the Eighth Amendment [and] offend contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess." <u>Id.</u>, at 1306. <u>Among those forms of punishment were "handcuffing inmates to the fence and to cells for long periods of time</u>, . . . ." <u>Ibid.</u> The fact that <u>Gates</u> found several forms of punishment impermissible does not, as respondents suggest, lessen the force of its holding with respect to handcuffing inmates to cells or fences for long periods of time. . . . In light of <u>Gates</u>, the unlawfulness of the alleged conduct should have been apparent to the respondents.

<u>Hope</u>, 122 S. Ct. at 2516-17 (alteration in original) (emphasis added) (involving handcuffing an inmate to a hitching post for several hours).[26]  The <u>Hope</u> Court

---

[26]It is also noteworthy that in <u>Saucier</u>, the Supreme Court reversed the Ninth Circuit for concluding that a right was clearly established based on the too-general proposition that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." 533 U.S. at 202. The <u>Saucier</u> Court said "that is not enough." <u>Id.</u> Instead, the Supreme Court stated, "as we explained in <u>Anderson</u>, the right allegedly violated must be defined at the

28

concluded that the Eleventh Circuit panel in <u>Hope</u>, by distinguishing between handcuffing an inmate <u>to a fence</u> for long periods in <u>Gates v. Collier</u>, 501 F.2d 1291 (5th Cir. 1974), versus handcuffing an inmate to <u>a hitching post</u> for several hours in <u>Hope</u>, had read the principle or rule of <u>Gates</u> too narrowly, and that <u>Gates</u> did give the necessary fair warning.[27]

---

appropriate level of specificity before a court can determine if it was clearly established." <u>Saucier</u>, 533 U.S. at 202 (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999)).

[27] The Supreme Court opinion at times speaks of <u>Hope</u> as an "obvious clarity" case in the manner of <u>United States v. Lanier</u>, 520 U.S. 259 (1997). <u>Hope</u>, 122 S. Ct. at 2514, 2516, 2518 (stating "[a]s the facts are alleged by Hope, the Eighth Amendment violation is obvious" and "[a]rguably, the violation was so obvious that even our own Eighth Amendment cases gave the respondents fair warning" and also referencing the "obvious cruelty inherent in this practice"). The <u>Hope</u> Court decision relied heavily on <u>Gates v. Collier</u>. Given the dearth of limiting facts in <u>Gates</u>, <u>Hope</u> appears to be a preexisting case law decision where the facts in <u>Hope</u> were not fairly distinguishable from those in <u>Gates v. Collier</u>. Few (or perhaps no) facts set out in <u>Gates</u> limit the scope of the <u>Gates</u> principle that handcuffing prisoners to fixed objects for punishment for long periods violates the Constitution. As we have already observed, the fewer facts set out in an opinion the broader the legal proposition decided: put differently, the fewer facts that are truly material to the legal conclusion. So, <u>Gates</u> gave fair warning to the defendants in <u>Hope</u>.

We recognize that the <u>Hope</u> Court also observed (a) that a preexisting Department of Justice ("DOJ") report condemned the hitching post practice and (b) that a general premise stated as part of the reasoning in <u>Ort v. White</u>, 813 F.2d 318 (11th Cir. 1987), that "physical abuse directed at [a] prisoner after he terminates his resistance to authority would constitute an actionable eighth amendment violation" gave some warning. <u>Hope</u>, 122 S. Ct. at 2517 (alteration in original). This DOJ report and <u>Ort</u>'s reasoning, however, only strengthened the fair notice or warning which the <u>Hope</u> Court had already decided was given by <u>Gates v. Collier</u>; neither the DOJ report nor <u>Ort</u>'s reasoning were held in <u>Hope</u> to be sufficient, apart

**E. Fair and Clear Notice to Stanfield**

In light of this precedent, we now determine whether the state of the law in 1998 provided Officer Stanfield with fair and clear notice or warning that his treatment of Vinyard during the jail ride was unconstitutional. Hope, 122 S. Ct. at 2516.

Regarding precedents, we conclude that no preexisting case law in 1998 involved materially similar facts or facts that gave a reasonable police officer in Stanfield's situation fair and clear warning that the conduct here, especially the use of pepper spray, violated the Constitution. But such fact-specific precedents are not always needed to overcome qualified immunity.

We must also inquire whether Stanfield's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him], notwithstanding the lack of fact-specific case law." Lee, 284 F.3d at 1199 (internal quotation marks omitted). As we stated in Marsh, "preexisting case law, tied to the precise facts, is not in every situation essential." Marsh, 268 F.3d at 1031 n.9.

---

from Gates, to afford officials the required fair and clear notice or warning. About Ort's reasoning, we recall the Supreme Court's earlier warning: "There is, of course, an important difference between the holding in a case and the reasoning that supports that holding." Crawford-El v. Britton, 523 U.S. 574, 585 (1998).

Although the "obvious clarity" standard is often difficult to meet, we conclude that the law in 1998 was clearly established that Stanfield's conduct, as Vinyard describes it, during the jail ride violated an arrestee's constitutional rights. Considering Vinyard's version of the events, no factually-particularized, preexisting case law was necessary for it to be very obvious to every objectively reasonable officer facing Stanfield's situation that Stanfield's conduct during the jail ride violated Vinyard's constitutional right to be free of the excessive use of force. To be more specific, no objectively reasonable police officer could believe that, after Vinyard was under arrest, handcuffed behind her back, secured in the back seat of a patrol car with a protective screen between the officer and the arrestee, an officer could stop the car, grab such arrestee by her hair and arm, bruise her and apply pepper spray to try to stop the intoxicated arrestee from screaming and returning the officer's exchange of obscenities and insults during a short four-mile jail ride. The peculiar facts of this case are "so far beyond the hazy border between excessive and acceptable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point." Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000); Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997); see note 18 supra.

## IV. DUE PROCESS CLAIM

Vinyard also argues that the district court erred in granting summary judgment on her due process claim under § 1983 against Sheriff Wilson individually for failure to investigate her complaint of police brutality. The district court first noted that the evidence does not support Vinyard's claim that the Sheriff's Office never investigated her complaint. Instead, the evidence reveals that the Sheriff's Office investigated her complaint on two occasions – in October 1998 and in February 1999. Even if Vinyard had created a factual issue as to whether her complaint was investigated in 1998, the district court concluded that Sheriff Wilson was entitled to qualified immunity because he acted within his discretionary authority and no preexisting authority clearly established that a failure to investigate a complaint, under similar circumstances, violates an individual's due process rights.

We agree that Sheriff Wilson is entitled to qualified immunity. We need apply only the first prong of Saucier's qualified immunity analysis because the Sheriff's alleged failure to investigate an excessive force complaint does not violate Vinyard's due process rights.[28] Vinyard argues that the failure to investigate her complaint when it was filed amounts to a "denial of substantive and procedural due process under the 14th Amendment." This Court has explained the

---

[28]We also agree that Vinyard failed to show that the Sheriff's Office did not investigate her complaint.

difference between substantive and procedural due process rights. "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)). Substantive due process rights are created by the constitution, and "no amount of process can justify [their] infringement." McKinney 20 F.3d at 1557. In order to have a substantive due process claim, Vinyard must have a substantive right created by the Constitution. McKinney, 20 F.3d at 1556. Vinyard has no substantive right of any kind to an investigation of her excessive force complaint by the Sheriff's Office, much less one created by the Constitution.

She also has no procedural due process claim. "Procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest." Zipperer v. City of Fort Myers, 41 F.3d 619, 623 (11th Cir. 1995). Property interests for the purposes of procedural due process are not created by the Constitution; "[r]ather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Morley's Auto Body, Inc. v. Hunter, 70 F.3d 1209, 1213 (11th Cir. 1995) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).

33

"As a result, these . . . rights constitutionally may be rescinded so long as the elements of procedural – not substantive – due process are observed." McKinney, 20 F.3d at 1556.

Vinyard is unable to show a procedural due process violation because there is no constitutionally protected liberty or property interest at stake in this case. Vinyard does not cite, nor have we found, any federal or state court decision, statute, regulation or other source of law that gives Vinyard an entitlement to an internal investigation by the Sheriff's Office of her complaints of police brutality. See Morley's Auto Body, 70 F.3d at 1214.[29]

Thus, the district court properly granted summary judgment to Sheriff Wilson on Vinyard's due process claim under § 1983.[30]

## V. CONCLUSION

---

[29]Vinyard cites several cases but they do not support her alleged due process right. For example, Vinyard cites Shaw v. Hospital Authority of Cobb County, 507 F.2d 625 (5th Cir. 1975), but it involved a podiatrist's application for staff privileges at a public hospital. Vinyard also cites Page v. Jackson, 398 F. Supp. 263 (N.D. Ga. 1975), but it concerned revocation of a municipal liquor license. The other cases cited by Vinyard are equally inapposite.

[30]We also affirm the district court's entry of summary judgment in favor of Sheriff Wilson on Vinyard's fraud claim under Georgia law. Vinyard's contentions on appeal as to her fraud claim clearly lack merit.

For all of these reasons, we affirm the district court's entry of summary judgment to Sheriff Wilson but reverse the entry of summary judgment in favor of Stanfield on Vinyard's excessive force claim as to the jail ride.

**AFFIRMED IN PART AND REVERSED IN PART**.