[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-15315
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 7, 2011
JOHN LEY
CLERK

D. C. Docket No. 07-01695-CV-ORL-19-UAM

RICHARD VAUGHN,
as Co-Personal Representative
of the Estate of Mario Jenkins,
deceased,
VALERIE JENKINS,
as Co-Personal Representative
of the Estate of Mario Jenkins,
deceased,

Plaintiffs-Appellants,

versus

CITY OF ORLANDO,
a public entity,
OFFICER DENNIS R. SMITH,

Defendants-Appellees,

ORLANDO POLICE DEPARTMENT,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(February 7, 2011)

Before BLACK and HULL, Circuit Judges, and HOWARD, District Judge.[*]


PER CURIAM:

Plaintiffs-Appellants, as co-representatives of the estate of Officer Mario Jenkins, appeal the district court's grant of summary judgment in favor of Defendants-Appellants Dennis R. Smith and the City of Orlando ("Orlando") in Plaintiffs' suit alleging violations of Officer Jenkins's civil rights pursuant to 42 U.S.C. § 1983 and state law claims. No reversible error has been shown. We affirm.

The material facts—as supported by the evidence in the record and with all reasonable inferences from those facts drawn in the light most favorable to Plaintiffs, see Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004)—are set out fully in the district court opinion and may be briefly summarized.

In September 2005, the Citrus Bowl in Orlando, Florida hosted a football

_____

[*]Honorable Marcia Morales Howard, United States District Judge for the Middle District of Florida, sitting by designation.

game between the University of Central Florida and Marshall University. Three public safety agencies worked the game and surrounding parking lots: the University of Central Florida Police Department ("UCF"); the Division of Alcoholic Beverages and Tobacco ("ABT"); and the City of Orlando Police Department ("OPD"). The first two agencies had officers in plainclothes and in uniform; the OPD officers were uniformed and were on bicycles. The agencies were especially concerned about fighting and rowdy crowds; at Central Florida's last game, University of Central Florida fans allegedly beat the mascot of the University of South Florida. Officers patrolled for incidents of underage drinking, fighting, and sexual assault.

Jenkins, a UCF officer, patrolled the Citrus Bowl parking lots in plainclothes, wearing a green shirt. Green is one of Marshall's school colors. Officer Jenkins patrolled alone, against the orders of his supervisor, and made a number of arrests for underage possession of alcohol. Around 5:00 p.m., Officer Jenkins approached a woman to obtain her identification. A group of others around her—which included Robert McLintock—threw beer bottles and otherwise began to attack Officer Jenkins physically. When McLintock attempted to flee, Officer Jenkins gave chase and eventually overtook McLintock. A photo contained in the record shows, and witnesses testified, that Officer Jenkins held a

3

gun to the side of McLintock's head. A civilian bystander, Michael Young, unaware that Officer Jenkins was with the UCF, wrestled Jenkins to the ground in an effort to protect McLintock.[1] Jenkins fired a warning shot or shots into the air—it is not clear if this was before or after Young wrestled him to the ground—and Jenkins also shot Young once in the abdomen. After shooting Young, Jenkins got back on his feet in a combat stance pointing his gun at Young.

Defendant Dennis Smith, a member of the OPD, also patrolled the parking lots and tailgating areas surrounding the Citrus Bowl. Officer Smith wore an OPD uniform and patrolled on bicycle. Smith overheard part of a civilian complaint made to his superior officer that a man in the Citrus Bowl crowd had a gun. Smith was dispatched by his superior to respond. Before arriving at the scene, Officer Smith heard multiple gunshots. Upon arriving at the scene, Smith saw Jenkins pointing his gun at a shot or injured man (Young) lying on the ground. Without warning, Smith shot Jenkins twice in the back and once in the rear right arm. Jenkins fired two shots towards Smith. Officer Jenkins died as a result of Officer Smith's shots.

There is a dispute about whether Smith had ever met Jenkins before the incident. Smith testified he did not recall meeting Jenkins prior to the shooting and

---

[1]Young testified he had no idea Jenkins was a police officer. Young believed Jenkins was a "crazy fan" attempting to kill McLintock, whom he also did not know.

that he did not know that Jenkins was a police officer until after he had shot Jenkins. But there is some testimony that Smith saw Jenkins briefly in a police hospitality tent earlier that day.[2] So we assume for the purposes of summary judgment that Smith had seen Jenkins briefly earlier that day. Nonetheless, there is no evidence that Smith had met or seen Jenkins before the day in question. Indeed, Agent James Ricky Davis, who aimed his gun at Jenkins during the scuffle with Young, had just spoken with Jenkins ten or fifteen minutes prior to the shooting, but Davis did not recognize Jenkins at the scene until after Jenkins had been shot.

Moreover, according to Major Randall Mingo, the highest ranking UCF police officer at the Citrus Bowl that day, the plainclothes UCF police officers, like Jenkins, were not wearing any distinctive type of clothing that would have alerted other officers (or civilians) to their identity as police officers. In fact, Major Mingo testified that at the time Jenkins arrived for duty that day, he was wearing a flowery shirt over a green shirt. However, at the time of the shooting, Officer Jenkins was wearing only a green shirt. This made Jenkins appear to be a Marshall University fan because green was Marshall's school color.

---

[2]ABT Officer Clement Punter testified that Smith and Jenkins had briefly met each other in the police hospitality tent a few hours prior to the incident when Officer Punter, Officer Jenkins, and Officer Smith stood around, ate pizza, and chatted about real estate over the course of a "couple of minutes." Major Randall Mingo, Jenkins's superior officer, also testified that he was "100 percent positive" that Officer Smith met Officer Jenkins in the police hospitality tent and that Smith and Jenkins discussed real estate. Civilians were not allowed in the police hospitality tent.

The district court granted Smith's motion for summary judgment based on qualified immunity: Smith violated no constitutional right of Jenkins. A law enforcement officer is entitled to qualified immunity if "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Smith's use of deadly force without warning was objectively reasonable in light of the facts and circumstances confronting Smith. See Garczynski v. Bradshaw, 573 F.3d 1158, 1166-67 (11th Cir. 2009). We agree.

Plaintiffs argue that the district court failed to view the facts and to draw all reasonable inferences in the non-moving party's (Plaintiffs') favor. Plaintiffs argue that Smith had met Jenkins earlier and should have known that Jenkins was an undercover officer. Plaintiffs argue that the inference to be drawn from this earlier meeting—that Smith knew or was unreasonable in not knowing that Jenkins was a police officer—places in dispute Smith's contrary statements that he did not remember meeting Jenkins, did not recognize him, and otherwise did not know that Jenkins was an undercover officer. Plaintiffs argue further that the stance assumed by Jenkins as he held Young at gunpoint was a combat stance that police are trained to assume and is recognizable by other officers as such. And Plaintiffs make much of the fact that two other officers on the scene who saw what Smith

6

saw did not shoot.

That Smith and Jenkins met earlier in the day is disputed; we accept for summary judgment purposes that an earlier meeting took place. We also note, however, the undisputed facts that the earlier meeting was brief, that Jenkins changed his clothes at some point after reporting for work that day, that Jenkins was wearing a green shirt at the time of the shooting that made him appear to be a Marshall fan, and that Jenkins could not otherwise be identified as an officer by his clothes at the time the shooting occurred. Officer Davis—one of the two other officers upon whom Plaintiffs rely—had met Jenkins previously and had contact with Jenkins shortly before the incident. Upon hearing shots and seeing the scuffling of Jenkins and Young, Davis failed to recognize Jenkins (the man on top), drew his gun, and took aim at Jenkins. Davis testified that he would have fired if he had seen that Jenkins had a weapon. The other officer—Captain German Garzon—testified that he did not draw his weapon upon witnessing the melee because he was in plainclothes and was worried about not being identified as a police officer.[3]

---

[3]Plaintiffs also dispute Smith's statement that he perceived himself to be in imminent danger because Jenkins was turning to fire at him. They cite the autopsy report as support for the fact that Smith's bullets entered Jenkins's back. It is undisputed that Jenkins did fire his weapon again. Regardless of whether Jenkins was turning to fire at Smith when Smith shot Jenkins, we conclude that Smith's actions were reasonable under the qualified immunity standard. We agree with the district court:

The threats to human life posed by Jenkins at the scene (i.e. that Jenkins was

Smith's entitlement to qualified immunity turns on whether his conduct was objectively reasonable in light of the facts and circumstances confronting him. See Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S. Ct. at 1872.

After construing all issues of disputed material fact in favor of Plaintiffs, we conclude that no Fourth Amendment violation is shown.[4] The facts and circumstances—which included receiving a complaint that a man in the crowd had a gun, hearing the sounds of multiple gunshots while en route to the scene, and

---

pointing a gun at Young, shots had been fired, Jenkins appeared to be poised to shoot again, and a crowd of bystanders was present) objectively supported Smith's decision to use deadly force, even without consideration of Smith's legitimate fear for his own safety.

Vaughn v. City [of] Orlando, No. 6:07-CV-1695, 2009 WL 3241801, at *6 n.8 (M.D. Fla. Sept. 29, 2009).

[4]As set out in the district court's opinion, Plaintiffs' reliance on "friendly fire" precedents from other jurisdictions is misplaced. Those cases are factually and materially distinguishable from the instant case. And, notwithstanding Plaintiffs' broad reading to the contrary, the cited cases establish no diminution of the applicability of qualified immunity to "friendly fire" cases.

8

seeing a man (not in police uniform but in a green shirt) pointing a gun at another man (who was lying shot or injured) and who appeared to be in a position to shoot again—made Smith's use of deadly force objectively reasonable; "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard, 311 F.3d at 1346.

Plaintiffs fail to cite other disputed material facts. Instead, Plaintiffs attempt to draw inferences unsupported by the evidence and engage in speculation and conjecture. See CBS Broad., Inc. v. EchoStar Commc'ns Corp., 450 F.3d 505, 517-19 n.25 (11th Cir. 2006) (inference based on speculation and conjecture is no reasonable inference sufficient to create a genuine issue of material fact for trial). Smith is entitled to qualified immunity on Plaintiffs' § 1983 claims.[5]

The district court also granted summary judgment in favor of Smith and the City of Orlando on Plaintiffs' state law claims. Plaintiffs fail to show the existence of a disputed issue of material fact precluding summary judgment on the asserted state law claims.

**AFFIRMED.**

---

[5]Plaintiffs also sought to hold the City of Orlando liable for Smith's acts. Because we conclude that Smith's acts violated no constitutional right of Jenkins, summary judgment in favor of the City of Orlando appropriately was granted on Plaintiffs' derivative § 1983 claim against the City of Orlando. See Case v. Eslinger, 555 F.3d 1317, 1328 (11th Cir. 2009) (absent a violation of plaintiff's rights by officer, no damages may be imposed upon the municipal employer).