[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15671
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 3, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00396-CV-T-N

D.S.,
by and through his mother and next friend, Tamella
Gail Stinson,

Plaintiff-Appellee,

TAMELLA GAIL STINSON,

Plaintiff,

versus

COUNTY OF MONTGOMERY, STATE OF ALABAMA,
DARRYL ANDREWS,
MILTON WEBB,
CHARLIE TERRELL,

Defendants-Appellants,

BRUCE HOWELL, et al.,

Defendants.

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(July 3, 2008)**

Before BIRCH, HULL and MARCUS, Circuit Judges.

PER CURIAM:

This case arises from the alleged rape of D.S., who at the time was eleven years old and a detainee at the Montgomery County Youth Facility ("MCYF"), by a fellow juvenile detainee. D.S., through his mother and then a guardian ad litem, brought suit against Montgomery County, Alabama (the "County"), which operates MCYF, and detention officers Milton Webb, Charlie Terrell, and Darryl Andrews. D.S. asserted claims under 42 U.S.C. § 1983 and various state law tort theories.

Webb, Terrell, Andrews, and the County brought this interlocutory appeal from the district court's order denying in part their motion for summary judgment based on qualified immunity and Alabama state-agent immunity. After review, we affirm in part and reverse in part.[1]

_____

[1] "We review de novo the district court's disposition of a summary judgment motion based on qualified immunity, resolving all issues of material fact in favor of Plaintiffs and then answering the legal question of whether Defendants are entitled to qualified immunity under that version of the facts." West v. Tillman, 496 F.3d 1321, 1326 (11th Cir. 2007). We review de novo the district court's rulings on state-agent immunity. See Tinker v. Beasley, 429 F.3d 1324, 1329 (11th Cir. 2005); Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000). "Even though the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the

# I. BACKGROUND

## A.  MCYF Juvenile Detention Facility

MCYF is a juvenile detention facility for young people aged seven to seventeen.  Defendants Webb, Terrell, and Andrews are juvenile detention officers at MCYF.  Detainees at MCYF are assigned to one of various wings of the facility based on their sex and age, although physical size and gang affiliation may also affect placement.

On April 14, 2002, D.S. was admitted to MCYF on charges of property theft and domestic violence.  Because he was an eleven year old male, D.S. was assigned to B-wing, which generally houses boys under the age of fifteen.  MCYF Detention Supervisor Barbara Cabble met with D.S. during the intake process.  Because D.S. was charged with hitting his mother, Cabble directed the MCYF staff members to "keep a close eye" on D.S.  Cabble issued this directive because she was concerned that D.S. might hurt another detainee.

Detainees at MCYF are assigned to single-person cells that are locked down at night.  During the day, detainees engage in various activities, such as attending classes, going to court, having visitation, going to the doctor, or eating in the

---

'actual' facts of the case, our analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the plaintiff." Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) (quotation marks and citations omitted).

cafeteria. Each wing has two dayrooms, thirty feet square, where detainees may watch television, play cards or board games, or read. Between the two dayrooms on B-wing is a control room with glass windows, from which officers monitor the detainees in the two dayrooms.

Officers monitor detainees by observing them through the windows in the control room, listening through the windows, and listening to audio amplification devices in the control room. Officers also periodically enter the dayrooms to monitor detainees there. MCYF's security manual provides that "[n]o detainee is to be left unsupervised," and that if an officer does leave a detainee unsupervised, such action "will be considered reasonable grounds for termination of employment."

## B. Events of April 18, 2002

MCYF has three detention wings, and its maximum detainee capacity is fifty-two juveniles. On April 18, 2002, there were twenty-nine detainees at MCYF.

Four to six detainees were in B-wing, including D.S. and C.P., the fifteen year old male who raped D.S. C.P. was detained on charges of first-degree robbery. In April 2002, C.P. was 5 feet 6 inches tall and weighed 150 pounds, while D.S. was 5 feet 4 inches tall and weighed 220 pounds.

4

D.S. began having problems with C.P. shortly after being admitted to MCYF. During the four-day span from April 14-18, 2002, C.P. had thrown shoes at D.S. on several occasions, and had punched D.S. in the back. D.S. testified that a staff member had witnessed one of the shoe-throwing incidents and D.S. had reported the punching incident. D.S. did not remember which staff member saw C.P. throw the shoe at him or which one took his report on the punching, although D.S. recalled that they were regular staff members assigned to B-wing.

D.S. testified that some time before April 18, 2002, B-wing staff "were informed that [C.P.] was threatening to have sex with a fourteen . . . year old white boy in B-Wing" and that in response MCYF staff told C.P. "that he better stop threatening to have sex with the white boys." However, D.S. did not remember: (1) the fourteen year old's name, (2) which staff member or members received the information about C.P.'s alleged threats, or (3) the name of the staff member who told C.P. that he should stop the threats.

In the late morning on April 18, 2002, D.S. and C.P. were alone in one of the B-wing dayrooms. This dayroom had a single bathroom which was next to the control room. The wall between the bathroom and the control room had a small plexiglass window that was approximately eight inches by sixteen inches. The detainees frequently cover the window with toilet paper so that the officers cannot

5

observe them while they are in the bathroom, and the window was so obscured on April 18, 2002. MCYF has a written policy that only one detainee is permitted in the bathroom at a time.

On the morning of April 18, 2002, the B-wing duty log shows that defendants Webb, Terrell, and Andrews were the officers on duty in MCYF's B-wing. D.S. and C.P. were alone in the dayroom playing cards during this late-morning period.[2] D.S. also testified that two officers were in the control room. D.S. identified the two officers as Webb, a defendant here, and Vincent Calhoun, a MCYF detention officer who is not a defendant in this case.

However, the parties agree that Calhoun was not working at MCYF on April 18, 2002, and that defendants Webb, Terrell, and Andrews were on duty. The two officers were next to the window on the far side of the control room (the one which faced the other dayroom). According to D.S., the officers were "reading newspapers and watching TV," and this was consistent with the officers' normal practice, which was to be less attentive when only a few detainees were present in a wing.

After playing cards with C.P. for about one hour, D.S. went to the bathroom. According to D.S., about a minute later, C.P. entered the bathroom with "his

_____

[2]The other B-wing detainees were in the other dayroom.

6

private out" and grabbed D.S. Despite D.S.'s attempts to fight him off, C.P. raped

D.S. During the attack, D.S. twice called for help from the staff "as loud as I

could." The first time D.S. said, "Staff, that man is messing with me"; the second

time, he called out, "Staff." However, no one came. After about five minutes, C.P.

stopped and let D.S. go.

D.S. left the bathroom and started to go knock on the window to the control

room. C.P. grabbed D.S., threw him in the corner, and told D.S. not to tell the

MCYF staff what had happened or C.P. would beat him. D.S. sat down at a table

in the dayroom. D.S. looked into the control room and saw the same two officers

he had seen earlier. One of the officers was still reading a newspaper, and the

other appeared to be doing something on a computer. Neither looked up from what

they were doing. After a few minutes, the two officers in the control room came

and escorted D.S. and C.P. to lunch. MCYF's B-wing duty log reflects that this

occurred at 11:40 a.m.

The parties agree that D.S. subsequently informed MCYF staff that he had

been raped by C.P.[3] Officers Joseph White and Marion Waver, who was the

MCYF Detention Supervisor, took D.S. to receive medical treatment. D.S. then

---

[3]The parties disagree as to which staff members D.S. told about the rape and the time at which he did so, specifically, whether it occurred during the 7 a.m. to 3 p.m. day shift or around 6 p.m. during the 3 p.m. to 11 p.m. evening shift. Because this appeal does not involve D.S.'s failure-to-provide-prompt-medical-care claim, we need not review that evidence.

went to the police station and told an officer there what had happened to him.

D.S. was examined at a rape crisis center on the evening of April 18, 2002 and by a doctor the next day. The doctor testified that his examination revealed a "significant" rectal tear and evidence indicating that D.S. had been sodomized on April 18, 2002.

## C. Court Proceedings

D.S., through his mother and later a court-appointed guardian ad litem, brought this lawsuit against the County and officers Webb, Terrell, and Andrews.[4] D.S. alleged that the defendants are liable under § 1983 for violating his Fourteenth Amendment due process rights through their deliberate indifference to detention conditions that posed a substantial risk of serious harm to him. D.S. also alleged that the defendants are liable under Alabama law for negligence, recklessness, and wantonness.

Defendants moved for summary judgment, asserting qualified immunity as to the federal § 1983 claim and Alabama state-agent immunity as to the state claims. The district court granted summary judgment to the County as to D.S.'s

---

[4]D.S. originally sued MCYF Juvenile Court Administrator Bruce Howell and Detention Director Jack Hunter, but later consented to Howell and Hunter being dismissed with prejudice. D.S. also originally sued Mason, but the district court granted Mason summary judgment as to all D.S.'s claims. D.S. did not cross-appeal the district court's grant of summary judgment to Mason and, therefore, we do not address any of the claims against Mason.

federal claim, but denied summary judgment to Webb, Terrell, and Andrews (collectively, the "Officers"), and also permitted D.S.'s state law claims against the County to proceed. The Officers and the County filed this interlocutory appeal. They argue that the district court erred in denying them qualified immunity and Alabama state-agent immunity.

## II. QUALIFIED IMMUNITY

The defense of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation marks and citation omitted). A government official claiming qualified immunity must first establish that he was acting within his discretionary authority. Cottone v. Jenne, 326 F.3d 1352, 1357-58 (11th Cir. 2003). If so, the plaintiff bears the burden of showing that qualified immunity is inappropriate. Id. at 1358. A two-part test ensues: First, the court must determine "whether the plaintiff's allegations, if true, establish a constitutional violation." Vinyard, 311 F.3d at 1346 (quotation marks and citations omitted). Second, if under the plaintiff's version of the facts a constitutional violation did occur, "the next . . . step is to ask whether the right was clearly established." Id. (quotation marks and

9

citation omitted).

There is no dispute in this case that the Officers were acting within their discretionary authority.  Hence, we turn to whether D.S. has alleged a violation of his constitutional rights.

D.S. alleges that the Officers' conduct violated D.S.'s Fourteenth Amendment right to be protected from the violence of fellow detainees.  This Court has held that "[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment." Cottone, 326 F.3d at 1358 (quotation marks, citation, and brackets omitted).[5]  To prove such a violation, a plaintiff must show that (1) an objectively substantial risk of serious harm existed, (2) the defendant official was subjectively aware of that risk, (3) the official responded to the risk in an objectively unreasonable way, and (4) the official's disregard of the risk caused the plaintiff injury.  Id. (citing Farmer v. Brennan, 511 U.S. 825, 834, 844-45, 114 S. Ct. 1970, 1977, 1982-83 (1994); Marsh v. Butler County, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc)).

With regard to the defendant official's subjective awareness of the risk, "the

_____

[5]Because D.S. was in a juvenile detention facility on criminal charges rather than following a criminal conviction, the deliberate indifference standard arises from the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause.  See Ingraham v. Wright, 430 U.S. 651, 671 n.40, 97 S. Ct. 1401, 1412 n.40 (1977).  However, "the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments."  Marsh v. Butler County, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (en banc).

10

official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313, 1320 (11th Cir. 2005) (quoting Farmer, 511 U.S. at 837, 114 S. Ct. at 1979). Moreover, the deliberate indifference standard is not to be confused with a negligence standard, as this Court has explained:

> The plaintiff must prove that the official had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence. Deliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the . . . harm will occur.

Gish v. Thomas, 516 F.3d 952, 954 (11th Cir. 2008) (quotation marks, citations, and brackets omitted) (emphasis added).

The district court held that D.S. had set forth a sufficient constitutional violation. The district court apparently acknowledged that the Officers may have been unable to predict that C.P. would try to rape D.S, but nevertheless held that the Officers were deliberately indifferent to D.S.'s welfare because they "grossly and inexcusably failed to meet" their responsibility to supervise and protect D.S. while he was in their custody. The district court reasoned that the Officers had failed in their supervisory and protective duty by (1) failing to prevent C.P. from following D.S. into the bathroom, (2) not removing the toilet paper that obscured

11

their view through the eight by sixteen inch window between the bathroom and the control room; (3) failing to respond to D.S.'s cries for help, and (4) reading the newspaper or working on a computer instead of observing the detainees.

On appeal the Officers argue that, in so holding, the district court improperly applied a negligence (or gross negligence) standard instead of the more stringent subjective-awareness standard required to establish deliberate indifference. We agree. Although the evidence taken in the light most favorable to D.S. may perhaps indicate that the Officers were negligent, or even grossly negligent, it does not satisfy the deliberate indifference standard.

There is simply insufficient evidence to create a factual issue as to whether the Officers were subjectively aware of, and were deliberately indifferent to, a substantial risk of serious harm to D.S. As of April 2002, detainee-on-detainee violence was "very rare" at MCYF, and the facility's Detention Director and Juvenile Court Administrator each testified that before April 18, 2002, no detainee had complained of being sexually assaulted while at MCYF. Moreover, C.P. had no history of sexual assault. Although D.S. testified that "staff assigned to supervise B-Wing" were aware that C.P. had thrown shoes at D.S. and punched him in the back, and that C.P. had threatened to have sex with another unidentified detainee, D.S. did not recall the names of the staff members who had this

12

information, and therefore has not countered the three defendant Officers' denials that they knew of these events. Furthermore, D.S. also has not countered the Officers' testimony that D.S. never told them that he feared he might be harmed, or sexually assaulted, by another detainee.

D.S. did testify that he yelled for help from the staff when C.P. entered the bathroom, and again during the rape, and that the Officers did not respond. The Officers denied hearing any calls for help, but acknowledged that had they occurred, they would have heard them. Thus, in the light most favorable to D.S., the evidence reveals that D.S. did call for help, and the Officers did hear the calls. However, D.S. testified that he only yelled, "Staff, that man is messing with me," and then, a moment later, "Staff." Given that: (1) the Officers did not know about the prior shoe-throwing and punch by C.P. against D.S., or that D.S. feared C.P.; (2) detainee-on-detainee violence at MCYF was a rarity; and (3) the Officers could not see what was going on in the bathroom (they denied seeing anything, and even D.S. testified that the window was covered with toilet paper), D.S.'s mere general calls for staff assistance and assertion that C.P. was "messing with" him were not enough to inform the Officers that D.S. faced a <u>substantial</u> risk of <u>serious</u> harm.[6]

_____

[6]D.S. contends, and the district court held, that the Officers' failure to remove the toilet paper so that they could see into the bathroom supports a finding of deliberate indifference. But while admittedly that course of action would have been prudent under the circumstances, it does not establish the element of subjective knowledge on the Officers' part of a substantial risk of

13

Thus, the Officers' failure to render assistance to D.S., while perhaps negligent, does not rise to the level of deliberate indifference. There is no evidence of any prior sexual assaults at MCYF, much less evidence of one occurring in the bathroom.

Consequently, even under D.S.'s version of the events, D.S. has not demonstrated a constitutional violation. The Officers are entitled to qualified immunity as to D.S.'s § 1983 claims against them.

### III. STATE-AGENT IMMUNITY

In addition to his § 1983 claim, D.S. asserts claims of negligence, recklessness, and wantonness under Alabama law. Whereas D.S.'s § 1983 claim was premised only on the defendants' alleged failure to protect him from a substantial risk of serious harm, his state law claims rely on three theories of wrongful conduct: (1) the defendants' failure to protect D.S. from harm; (2) their decision to place D.S. in MCYF's general detention population; and (3) their failure to provide D.S. with prompt medical care following the rape.

With respect to D.S.'s state law claims, the Officers and the County argue that they are entitled to summary judgment on the basis of Alabama state-agent

---

serious harm, especially given that no prior sexual assaults had occurred at MCYF.

14

immunity.[7]  We first discuss the types of immunity available under Alabama law

and then apply that law to the facts of this case.

## A.    Alabama Law

The doctrine of state-agent immunity "protects state employees, as agents of

the State, in the exercise of their judgment in executing their work

responsibilities."  Ex parte Hayles, 852 So. 2d 117, 122 (Ala. 2002).  This doctrine,

which derives from provisions of the Alabama Constitution, had formerly turned

on whether the defendant was engaged in a discretionary function.  See, e.g.,

DeStafney v. Univ. of Ala., 413 So. 2d 391, 392-95 (Ala. 1982).  However, the

Alabama Supreme Court reformulated the state-agent immunity rule in Ex parte

Cranman, 792 So. 2d 392, 405 (Ala. 2000).[8]  Cranman held that state agents are

entitled to immunity for conduct that falls into one or more of five enumerated

categories, as follows:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
> (1) formulating plans, policies, or designs; or
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to,

---

[7]Because D.S.'s claims against the County rest solely upon a respondeat superior theory, the County argues correctly that if the Officers are entitled to state-agent immunity, it will likewise be immune.  See City of Crossville v. Haynes, 925 So. 2d 944, 954 (Ala. 2005).

[8]Although Cranman was a plurality decision, the Alabama Supreme Court adopted the Cranman immunity test in Ex parte Butts, 775 So. 2d 173, 177-78 (Ala. 2000).

15

examples such as:
>  (a) making administrative adjudications;
>  (b) allocating resources;
>  (c) negotiating contracts;
>  (d) hiring, firing, transferring, assigning, or supervising personnel; or
>
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
>
> (4) exercising judgment in the enforcement of the criminal laws of the State, including but not limited to, law-enforcement officers' arresting or attempting to arrest persons[, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code]; or
>
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Cranman, 792 So. 2d at 405, modified by Hollis v. City of Brighton, 950 So. 2d 300, 309 (Ala. 2006). Categories three and four are at issue here.

Cranman's above category four, as modified by Hollis, incorporates Alabama Code § 6-5-338(a), which specifically governs the immunity afforded Alabama peace officers. See Hollis, 950 So. 2d at 307-09. Section 6-5-338(a), "by its terms, extends state-agent immunity to peace officers performing discretionary functions." Id. at 308 (quotation marks, citation, and emphasis omitted). The statute states:

> Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state . . . and whose duties prescribed by law, or by the lawful terms of their employment

16

or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a). "Although § 6-5-338(a) speaks in terms of immunity for discretionary functions," the Alabama Supreme Court has made clear that peace officer immunity pursuant to § 6-5-338(a) is a species of state-agent immunity and thus is analyzed "under the principles set forth in Cranman." Ex parte Kennedy, ___ So. 2d. ___, 2008 WL 1838311, at *5 (Ala. Apr. 25, 2008) (quotation marks and citations omitted).

Further, in determining whether state-agent immunity applies at the summary judgment stage, Alabama courts employ a burden-shifting analysis. Ex parte Ala. Dep't of Mental Health & Mental Retardation, 937 So. 2d 1018, 1023 (Ala. 2006). First, "the party seeking to assert the defense must present evidence indicating that the claims asserted against him or her arise from the performance of a discretionary act" that falls within one of the categories specified by Cranman. Id. at 1024. If he does so, "then the burden shifts to the plaintiff to show that the defendant acted in a manner that precludes the application of State-agent

17

immunity." Id. For example, the plaintiff may show that the defendant acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Cranman, 792 So. 2d at 405. We now turn to D.S.'s claims.

**B.     D.S.'s Claims**

The district court granted summary judgment to the Officers and the County on D.S.'s placement-in-general-population claim and failure-to-provide-prompt-medical-care claim. However, it denied summary judgment on the failure-to-protect claim, concluding that the Officers and the County had not met their burden of establishing that the failure-to-protect claim arose from the Officers' performance of one of the categories of discretionary duties enunciated in Cranman. Thus, we examine the Officers' state-agent immunity as to D.S.'s failure-to-protect claim.

In denying immunity, the district court relied upon Alabama Department of Mental Health, in which the Alabama Supreme Court had held that two employees of a state mental health facility were not entitled to state-agent immunity from claims premised on their alleged failure to intervene in a fellow employee's beating of a resident. 937 So. 2d at 1020, 1028-29. The Alabama Supreme Court in Alabama Department of Mental Health rejected the defendants' claim of immunity

18

because it rested upon conclusory statements of discretion that lacked evidentiary support, citation to a specific applicable rule or regulation governing the defendants' conduct, or an explanation of the kind of discretion involved in their decision not to intervene. Id. at 1028-29. Here, the district court likewise held that the Officers offered only conclusory statements as to why they failed to supervise or protect D.S. and provided no explanation of how their actions fell within the performance of a discretionary function. Thus, it denied state-agent immunity on the failure-to-protect claim under state law.

The Appellants argue that this holding was erroneous, and that they qualify for state-agent immunity because they were: (1) discharging duties imposed by regulation (Cranman immunity category three); and (2) exercising judgment as peace officers pursuant to Alabama Code § 6-5-338(a) (Cranman category four). We disagree.

First, the Officers cannot demonstrate that their conduct comes within category three of Cranman, which extends immunity to state agents[9] who are "discharging duties imposed . . . by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the

---

[9]Although the Officers were employed by the County instead of the State, the Alabama Supreme Court has expressly held that state-agent immunity extends to municipal employees. City of Birmingham v. Brown, 969 So. 2d. 910, 916 (Ala. 2007).

19

State agent performs the duties in that manner." Cranman, 792 So. 2d at 405. The Officers argue that Alabama Department of Mental Health, relied upon by the district court, is distinguishable because they, unlike the defendants in that case, cited specific rules and regulations that governed their juvenile detention duties. The Officers point out that MCYF has mandated that they follow certain rules and policies embodied in American Correctional Association juvenile detention facility standards and set forth in the MCYF security manual and detainee handbook. Specifically, the defendant Officers emphasize these particular rules, contained in at least one of those sources: (1) the requirement that they maintain a 1:8 officer to juvenile detainee ratio at all times; (2) the maximum detention capacity requirement at MCYF; (3) the rule providing that detainees are to be assigned into wings based on sex, age, size, and gang affiliation; and (4) the MCYF policy that detainees be supervised and that no detainee be left unsupervised.

The first three rules the Officers cite are not relevant to D.S.'s failure-to-protect claim. Although it may be true that the Officers would be immune from suit based on their discharge of duties imposed by those rules, this is not such a lawsuit. D.S. does not allege that the Officers' implementation of the 1:8 ratio, maximum detention capacity, or detainee assignment rules resulted in the rape.[10]

---

[10]It is possible that D.S.'s placement-in-general-population claim may have implicated the detainee assignment rule. However, the district court granted summary judgment to

20

Rather, D.S.'s claim is that the Officers neglected their duty to supervise him and C.P. and therefore failed to prevent C.P. from raping him. Thus, the fourth rule the Officers cite is relevant. As to that rule, MCYF's security manual sets forth the facility policy regarding supervision and expressly provides, "No detainee is to be left unsupervised. Leaving a detainee unsupervised will be considered reasonable grounds for termination of employment."

Under D.S.'s version of the facts, the Officers totally failed to supervise D.S. and C.P., and thus violated this rule. The Officers simply do not explain how they were adhering to the continuous supervision rule under D.S.'s version of the facts. Under D.S.'s version, instead of looking into the B-wing dayroom or its bathroom or even paying attention to D.S.'s cries for help, the Officers were either reading the newspaper or were on the computer and were not supervising the B-wing detainees at all. Thus, at the summary judgment stage, the Officers here cannot establish immunity based on their assertion that they performed their duties in accordance with the pertinent rule.[11] Accordingly, the Officers have not

_____

defendants on that claim, and that holding is not before us on appeal.

[11]Cranman category three also requires that the pertinent rule or regulation "prescribe[] the manner for performing the duties" at issue. Cranman, 792 So. 2d at 405. The rule the Officers cite arguably does not prescribe any specific manner for supervising juvenile detainees other than simply requiring that it be done continuously. However, we need not decide the issue of whether the rule prescribes "the manner" of performing the supervision duty because D.S.'s claim is that the Officers were not supervising himself and C.P. at all and thus were not following the continuous supervision duty prescribed by the rule in any event.

demonstrated that they satisfy category three of the type of conduct for which Cranman extended state-agent immunity.

Alternatively, the Officers argue that they satisfy Cranman category four, which extends immunity to peace officers performing discretionary functions within the scope of their duties, as provided by Alabama Code § 6-5-338(a). See Hollis, 950 So. 2d at 309.

Under the facts viewed in the light most favorable to D.S., the Officers cannot demonstrate that they were performing a discretionary function within the scope of their duties under Alabama law. While state-agent immunity provides that a peace officer may be immune for performing discretionary duties, where a rule expressly mandates that certain actions be taken–such as leaving no juvenile detainee unsupervised–the officer's discretion is removed. "Alabama law has defined 'discretionary acts' as 'those acts as to which there is no hard and fast rule as to course of conduct that one must or must not take' and those requiring 'exercise in judgment and choice and involving what is just and proper under the circumstances.'" Norris v. City of Montgomery, 821 So. 2d 149, 153 (Ala. 2001) (quotation marks, citation, emphasis, and brackets omitted); see also Howard v. City of Atmore, 887 So. 2d 201, 208 (Ala. 2003) ("[A] State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties

22

pursuant to detailed rules or regulations, such as those stated on a checklist.")

(quotation marks, citations, and emphasis omitted).

The parties agree that MCYF policy required the Officers to supervise the juvenile detainees at all times. And D.S. testified that the Officers failed to even look at, much less supervise, him and C.P. at all during the relevant time in the dayroom and bathroom. Under the summary-judgment-stage facts, the Officers had no discretion to leave a detainee unsupervised, but did exactly that.[12] Therefore, the Officers are not entitled to state-agent immunity based on the performance of discretionary peace officer functions.[13] Because the Officers are not immune from D.S.'s state law failure-to-protect claims, the County likewise lacks immunity.

## IV. CONCLUSION

For the reasons set forth above, we reverse the district court's order insofar as it denies Appellants Andrews, Webb, and Terrell qualified immunity from suit

---

[12]We note that this is not a case in which the alleged failure to supervise a particular detainee could arguably be considered discretionary because of other concurrent duties imposed upon the Officers that conflicted with the duty to supervise (for example, where an officer must divert his attention from one detainee to render medical aid to another, or where for some reason it is impossible or impracticable to watch all detainees simultaneously). Here, the Officers maintain that they could, and did, supervise all detainees adequately, but D.S.'s version of events is simply otherwise.

[13]Because of this holding, we need not reach the issue, raised by D.S., of whether the juvenile detention officer defendants qualify as "peace officers" under Alabama Code § 6-5-338(a).

on D.S.'s § 1983 claim, but affirm the district court's denial of Alabama state-agent immunity.  We remand to the district court for further proceedings in accordance with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**