[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10988

_____

D. C. Docket No. 06-00053 CV-5-RS-MD

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 9, 2008
THOMAS K. KAHN
CLERK

JESSE DANIEL BUCKLEY,

Plaintiff-Appellee,

versus

HON. BOBBY HADDOCK,
in his official capacity as
Sheriff of Washington County,

Defendant,

JONATHAN RACKARD,
in his individual capacity,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(September 9, 2008)**

Before EDMONDSON, Chief Judge, and DUBINA, Circuit Judge, and
MARTIN,* District Judge.

_____

*Honorable Beverly B. Martin, United States District Judge for the Northern District of
Georgia, sitting by designation.

EDMONDSON, Chief Judge:

This case involves an excessive-force claim and arises from an encounter between a sheriff's deputy and a motorist who refused to submit to lawful arrest during a traffic stop. Deputy Jonathan Rackard seeks interlocutory review of the district court's decision denying him qualified immunity for the repeated use of a taser in effecting the arrest of Jesse Buckley ("Plaintiff"). Because Deputy Rackard's use of force was not unconstitutionally excessive and, in any event, because the preexisting law at the time did not clearly establish that this use of force was excessive, we reverse the district court's decision and remand the case for dismissal of the federal claims against Deputy Rackard.

I.  Background[1]

Rackard, a deputy sheriff in Washington County, Florida, stopped Plaintiff for speeding in March 2004. The traffic stop occurred at night on the side of a

---

[1]The entire incident at issue was captured by a police video camera. We recount the facts as depicted in the videotape, which is part of the record. See Scott v. Harris, 127 S. Ct. 1769, 1776 (2007) (stating that the court of appeals "should have viewed the facts in the light depicted by the videotape"). The affidavits and other evidence in the record are consistent with the videotape. We take the record in Plaintiff's favor; so, when we write that Plaintiff says "X", we have accepted "X" as a fact for this appeal.

two-lane highway that had no street lights. It was dark.

Financially destitute and homeless, Plaintiff became agitated about getting a ticket. Plaintiff began to sob. Despite Deputy Rackard's repeated requests, Plaintiff refused to sign the traffic citation: signing is required by law. See Fla. Stat. § 318.14(2)-(3). Deputy Rackard warned Plaintiff twice that, if he did not sign the citation, he would be arrested. After the second warning, Plaintiff said "arrest me." Without resisting, Plaintiff allowed himself to be handcuffed; he was then still sitting in his vehicle.[2] Now handcuffed, Plaintiff got out of his car.

As the deputy started to walk with Plaintiff to the patrol car, Plaintiff -- a 23-year-old young man who weighed 180 pounds and was 6 feet, 2 inches tall -- dropped to the ground behind his car, crossed his legs, and continued to sob. Deputy Rackard cautioned Plaintiff about the danger of getting hit by traffic on the nearby road. Plaintiff responded, "My life would be better if I was dead."[3]

---

[2] The issue before us is whether excessive force was used. Plaintiff does not dispute that he refused to sign the traffic citation. For background, see Fla. Stat. § 318.14(2)-(3); Robinson v. City of Miami, 867 So. 2d 431, 432 (Fla. Dist. Ct. App. 2004) (concluding that a refusal to sign a citation establishes probable cause to arrest). By the way, Plaintiff pleaded no contest to one count of refusal to sign a speeding ticket and to one count of resisting arrest without violence; Plaintiff "does not quarrel with his lawful conviction."

Compare Reese v. Herbert, 527 F.3d 1253, 1273 (11th Cir. 2008) (concluding that excessive force was used in the context of an arrest without even arguable probable cause to arrest).

[3] The audio on this sentence is not completely clear. The word "my" might be something else. But we think that it is "my."

3

Deputy Rackard asked Plaintiff several times to stand up. Plaintiff did not do so. The deputy then attempted to lift Plaintiff to his feet; but Plaintiff remained limp and did not stand. After repeatedly and plainly warning Plaintiff that a taser device would be used (to which Plaintiff shouted, "I don't care anymore -- tase me") and after giving Plaintiff some time to comply, the deputy discharged the taser. The taser was used for approximately five seconds in the "stun gun" mode. The deputy applied the taser's electrodes directly to Plaintiff's clothed back and chest. After Deputy Rackard discharged the taser, he asked Plaintiff again to stand up; but Plaintiff did not comply. Again, the deputy plainly warned Plaintiff that the taser would be used. Plaintiff still did not stand. After some time, Deputy Rackard discharged the taser for another five-second burst. The taser delivers an electrical shock; it hurts.

At this point, Deputy Rackard walked to his patrol car and, by radio, called for backup. Plaintiff remained on the ground. When the deputy returned, he ordered Plaintiff to get up. Again, Deputy Rackard plainly warned Plaintiff that the taser would be used and allowed Plaintiff time to comply. The deputy then attempted a second time to lift Plaintiff to his feet, but to no avail. Plaintiff still did not stand; and the deputy used the taser a third time. Even though Plaintiff continued to resist moving to the patrol car, Deputy Rackard made no more use of

the taser.

Once another police officer arrived, Plaintiff promptly relented; and with the assistance of the other officer, Deputy Rackard escorted Plaintiff to the patrol car without incident. Plaintiff suffered sixteen small burn marks on his back from the taser with some scarring (the record does not say whether or not the scars are permanent) and keloid growth around some of the burns.[4] Plaintiff also claims that he suffered emotional injury from the incident: He says that he now finds it difficult to trust police officers and to ask for their assistance.

Plaintiff brought this section 1983 suit against Deputy Rackard in his individual capacity, alleging that the deputy used excessive force in violation of the Fourth Amendment.[5] Deputy Rackard moved for summary judgment on the basis of qualified immunity, which the district court denied.

---

[4]The taser was used three times. The taser might have touched Plaintiff more than once each time, however, because Plaintiff would move when the taser was applied. The taser has two prongs; so, Plaintiff says he came into contact with the taser at least eight times.

[5]Plaintiff also sued Bobby Haddock as the Sheriff of Washington County; the district court's decision granting summary judgment to the Sheriff on all claims against him in his official capacity is not before us, however.

## II. Discussion

### A. Excessive Force Claim

That the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it" is well established. Graham v. Connor, 109 S. Ct. 1865, 1871-72 (1989).

For excessive force claims, "objective reasonableness" is the test. Zivojinovich v. Barner, 525 F.3d 1059, 1072 (11th Cir. 2008). But we have noted some secondary factors to consider: "'(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.'" Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (quoting Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002)). The nature and degree of force needed is measured by such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 109 S. Ct. at 1872; see also Lee, 284 F.3d at 1198 ("[T]he force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the

6

crime, the danger to the officer, and the risk of flight.").

The Supreme Court teaches that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Graham, 109 S. Ct. at 1872 (internal quotation marks omitted) (alteration in original). Instead, we must "slosh our way through the factbound morass of 'reasonableness.'" Scott v. Harris, 127 S. Ct. 1769, 1778 (2007); see also Graham, 109 S. Ct. at 1872 ("[P]roper application [of the reasonableness test] requires careful attention to the facts and circumstances of each particular case . . . ."). As we have said before, courts must "look[] to the 'totality of circumstances' to determine whether the manner of arrest was reasonable." Draper, 369 F.3d at 1277.

We do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest. The Court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense. We are to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott, 127 S. Ct. at 1778 (internal quotation marks omitted). In the constitutional context, reasonableness -- on a given set of facts -- is "a pure

question of law." Id. at 1776 n.8.

In the light of the undisputed facts established in the record, we conclude that Defendant's use of force in this particular situation was not outside the range of reasonable conduct under the Fourth Amendment. Of particular importance are three facts. First, the incident occurred at night on the side of a highway with considerable passing traffic.[6] Second, the deputy could not complete the arrest -- that is, truly control Plaintiff -- because Plaintiff was resisting. Third, the deputy resorted to using the taser only after trying to persuade Plaintiff to cease resisting, after attempting to lift Plaintiff, and after repeatedly and plainly warning Plaintiff that a taser would be used and then giving Plaintiff some time to comply.

Although, as the district court observed, the underlying offense of refusing to sign a traffic citation was relatively minor, we nevertheless credit the government with a significant interest in enforcing the law on its own terms, rather than on terms set by the arrestee. The government has an interest in arrests being completed efficiently and without waste of limited resources: police time and energy that may be needed elsewhere at any moment. Even though Plaintiff was handcuffed, he still refused repeatedly to comply with the most minimal of police

---

[6]By our count, some 14 vehicles passed nearby the site of the traffic stop during the approximately 8 minutes that the deputy and the Plaintiff were both exposed on the roadside, that is not inside a car.

instructions -- that is, to stand up and to walk to the patrol car. That Plaintiff was resisting arrest weighs in the deputy's favor.[7] In addition, to the extent that the incident occurred beside an active highway at night, we also credit the government's interest in the safety of Deputy Rackard, Plaintiff, and even passing motorists: a legitimate interest to be advanced by putting Plaintiff in the patrol car. See Pennsylvania v. Mimms, 98 S. Ct. 330, 333 (1977) (acknowledging that the "hazard of accidental injury from passing traffic" may be "appreciable" in some situations). Deputy Rackard warned Plaintiff early on that they should not remain exposed alongside the highway for fear of being hit by a passing vehicle.

Against these important governmental interests weigh the nature and quality of the intrusion on Plaintiff's Fourth Amendment interests. Plaintiff alleges that he sustained, as a result of Deputy Rackard's acts, emotional injury as well as sixteen small taser burns, which caused some scarring and keloid growth. Although Plaintiff's injuries are not insignificant, neither are they severe. Plaintiff points to no evidence in the record that the deputy's use of the taser caused any

---

[7]That Plaintiff did not attack or menace the deputy does not shield Plaintiff from the use of force, even if it might result in pain. See Forrester v. City of San Diego, 25 F.3d 804, 807-08 (9th Cir. 1994) (concluding that there was no violation of the Fourth Amendment where officers used pain compliance techniques — which caused injuries including bruises, a pinched nerve, and one broken wrist — to move demonstrators who were passively resisting arrest).

9

second-order physical injuries;[8] nor has Plaintiff pointed to evidence that the burns

he did sustain required medical attention.  Accordingly, we regard the deputy's use

of the taser in this particular case as -- at most -- moderate, non-lethal force.[9]  See

Sanders v. City of Fresno, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008) (viewing

"the use of a Taser as an intermediate or medium, though not insignificant,

quantum of force").

While conceding that a single use of the taser might arguably have been

reasonable, the district court nevertheless concluded (and Plaintiff argues) that the

other applications of the taser were grossly disproportionate and unnecessary,

especially given that the arrest had been "fully secured" and given that backup was

en route to assist in moving Plaintiff to the patrol car.

We disagree.  Never was Plaintiff fully secured until after the second officer

arrived.  The district court's suggestion that Plaintiff had been fully secured

because he was handcuffed is mistaken: Plaintiff was not bound at the feet (so, he

---

[8]For instance, Plaintiff did not suffer a broken bone or any other physical injury due to contact with the ground caused by the taser shock.

[9]The record does not reveal much about the particular characteristics of the taser used by Deputy Rackard.  What little it does reveal shows that the Washington County Sheriff's Department considered tasers to be non-lethal control devices.  In addition, other courts have described tasers as non-lethal devices used to control persons resisting arrest.  See, e.g., Plakas v. Drinski, 19 F.3d 1143, 1150 n.6 (7th Cir. 1994).  Plaintiff points to no evidence in the record showing that tasers are lethal or that they pose a substantial risk of causing serious bodily injury.

could both run and kick), he was moving around on the ground alongside a busy road, and he would not comply with the deputy's repeated instructions to stand up and to move to the patrol car where Plaintiff could be confined. An objectively reasonable police officer could rightly believe that force was therefore necessary to secure the non-compliant Plaintiff in the patrol car and thereby complete the arrest.

We also reject the district court's rationale that had Deputy Rackard "simply waited for back up, two officers could have lifted [Plaintiff] and carried him to the car without any application of force." A single officer in the deputy's situation confronting a non-compliant arrestee like Plaintiff need not -- as a matter of federal constitutional law -- wait idly for backup to arrive to complete an otherwise lawful arrest that the officer has started.

The federal courts must not dictate through their interpretation of the Constitution how the police should allocate their limited resources. In most circumstances where an arrestee is resisting, a single officer can constitutionally effectuate an otherwise lawful arrest by resorting to the use of moderate, non-lethal force. No constitutional basis exists for requiring two or more officers to make routine arrests, even if deploying more officers might result in less force actually being used. See Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th

11

Cir. 1994) ("'The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable.'" (quoting Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)).

That an officer has requested more police assistance does not make the use of force before reinforcements arrive unreasonable. For instance, that the deputy called for backup after his second use of the taser does not render the third use unreasonable or excessive because the facts and circumstances that justified the first use still apply: that is, Plaintiff continued to resist arrest, the deputy and Plaintiff's safety while on the side of a highway at night was still at risk (not to mention the safety of other motorists), and the use of the taser itself was moderate, non-lethal force.

Needless to say, officers acting alone may not always use any and all force necessary to complete an arrest without assistance. If Deputy Rackard had used more severe techniques (beaten Plaintiff's head with a club or shot him, for example), this case would be a different case. Here, the record shows that Deputy Rackard only used moderate, non-lethal force; and he did so only after reasoning with Plaintiff, then after trying to lift Plaintiff, and finally after repeatedly warning Plaintiff -- a warning given before each use of the taser -- that a taser would be

12

used. In short, Deputy Rackard gave Plaintiff ample warning and opportunity to cease resisting before the deputy resorted gradually to more forceful measures. Even then, Plaintiff's injury was not great; and the deputy holstered his taser after using it briefly three times.

This case is not one where a compliant arrestee was abused for no good reason. Cf., e.g., Hadley v. Gutierrez, 526 F.3d 1324 (11th Cir. 2008) (handcuffed, non-resisting arrestee in the custody of two officers is beaten). In the light of all the circumstances, therefore, we conclude that Deputy Rackard's use of force was not unconstitutionally excessive.[10]

## B. Qualified Immunity

Although we conclude that the Constitution was not violated at all, we will also decide about immunity. Even if some of the deputy's use of force was excessive under the Fourth Amendment, we conclude nevertheless that he is entitled to qualified immunity because he -- given the circumstances he was facing

---

[10]We must always recall that police officers are making hard decisions under difficult circumstances and within severe time constraints. Such decisions are easy to criticize later. The law makes allowances for the police officer as the person on the spot. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 109 S. Ct. at 1872.

-- violated no already clearly established federal right.

In their individual capacities, government officials are entitled to immunity from suit "unless the law preexisting [their] supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in [their] place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002); see also Marsh v. Butler County, 268 F.3d 1014, 1031 (11th Cir. 2001) (en banc) (stating that "fair and clear notice to government officials is the cornerstone of qualified immunity").

We have pointed out before that "[g]overnment officials are not required to err on the side of caution." Marsh, 268 F.3d at 1030 n.8; see also Saucier v. Katz, 121 S. Ct. 2151, 2158 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."). As a consequence, qualified immunity does protect "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 106 S. Ct. 1092, 1096 (1986).

With these principles in mind, Plaintiff must demonstrate that, from the

preexisting law, the deputy had "fair and clear notice" that the deputy's conduct would break federal law. See Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002); see also Saucier, 121 S. Ct. at 2156 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). To show that the law was clearly established in a case like this "where the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting caselaw that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law." Thomas v. Roberts, 323 F.3d 950, 954 (11th Cir. 2003). If an earlier case is "fairly distinguishable from the circumstances facing a government official," then that case cannot "clearly establish the law for the circumstances facing that government official." Vinyard, 311 F.3d at 1352; see generally Marsh, 268 F.3d at 1030-33.

Neither Plaintiff nor the district court has cited case-law establishing that Deputy Rackard's use of the taser was clearly unlawful. Both rely on Lee, 284 F.3d at 1188, in which this Court denied qualified immunity to a defendant police officer on an excessive force claim. In Lee, the facts showed that the officer pulled over a young woman during the afternoon rush hour for a minor traffic

15

violation, forced her out of her car, handcuffed her, and led her to the back of the car where the officer slammed her head against the car's trunk and kept spreading her legs with his foot. Id. at 1191, 1198. Construing the facts in the light most favorable to the woman, the Lee panel stressed that she did not resist the officer at any time during the incident. Id.

The district court thought the present case was "analogous,"[11] concluding that -- like the facts in Lee -- the crime here was minor, Plaintiff posed no threat to the deputy or anyone else, and Plaintiff "never actively resisted or attempted to evade arrest by flight." The district court, as well as Plaintiff in his brief, placed considerable stress on the fact that Plaintiff had already been handcuffed, that Plaintiff resisted only passively, and that the deputy used the taser more than once.

We regard Lee as easily distinguishable from the facts and circumstances of this case. At best, Lee decides only that no officer can use force against an arrestee who is already handcuffed and who is resisting arrest in no way.[12] But

---

[11]In the qualified immunity context, "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Hudson v. Hall, 231 F.3d 1289, 1297 (11th Cir. 2000). In the light of preexisting law, "the unlawfulness must be apparent." Anderson v. Creighton, 107 S. Ct. 3034, 3039 (1987).

[12]In addition to Lee, other cases then in existence similarly established that an officer may not use force against an arrestee who was handcuffed and who was not resisting arrest. See, e.g., Vinyard, 311 F.3d at 1348-49 (holding that the officer used excessive force by discharging pepper spray into the eyes of an arrestee who was handcuffed, secured in the back of the patrol car, and posed no threat to the officer); Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000) (holding that officers used excessive force by repeatedly beating arrestee, "even though he was

16

unlike Lee, where the court stressed that the arrestee did not resist at any time during the arrest, here Plaintiff did resist: for example, he physically dropped to the ground, repeatedly refused to comply with the deputy's reasonable orders (even after being warned that a taser would be used), and made no effort to stand when the deputy attempted on two occasions physically to lift Plaintiff to his feet. The use of force in Lee was wholly uncalled for; Lee decides nothing about the gamut of options for force usage in the circumstances of arrestee intransigence. The circumstances that call on police to use some intermediate force -- between no force and deadly force -- remain the cases where the law of excessive force is most ambiguous. It will probably always be so, considering the limitless set of potential different fact combinations and the necessity of allowing for flexible responses from the police.

Lee does not control this case. More important for qualified immunity purposes, an objectively reasonable police officer could have believed that additional facts present here but not present in Lee -- for instance, that Plaintiff was resisting arrest on a roadside at night and that the deputy plainly warned Plaintiff before using the taser -- might "make a difference" about whether the conduct in the present case would violate federal law. See generally Marsh, 268

_____

handcuffed and did not resist, attempt to flee, or struggle with the officers in any way").

17

F.3d at 1032-33 (discussing when preexisting precedents cannot clearly establish the applicable law). Therefore, whatever fair and clear warning about unconstitutional force that <u>Lee</u> (or any other decisional law that has been drawn to our attention) gives does not reach the factual particularities of this case. Furthermore, the force used here did not approach being so excessive as obviously to violate the Fourth Amendment on its face. <u>Cf.</u>, <u>e.g.</u>, <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919 (11th Cir. 2000) (denying qualified immunity -- in the absence of controlling judicial precedent -- where defendant police officers ordered dog to attack a compliant, non-resisting arrestee). At the very least, therefore, Deputy Rackard is entitled to qualified immunity.

## III. Conclusion

Plaintiff resisted arrest. Given this circumstance in the context of all the other facts, Deputy Rackard's gradual use of force, culminating with his repeated (but limited) use of a taser, to move Plaintiff to the patrol car was not unconstitutionally excessive. In addition, even if Plaintiff could establish that some of the deputy's use of force violated the Fourth Amendment, the deputy still would be entitled to qualified immunity because the applicable law at the time did

18

not clearly establish that the deputy's conduct -- given the circumstances -- was unconstitutional. Accordingly, the district court erred in denying Deputy Rackard's motion for summary judgment.

REVERSED and REMANDED.

DUBINA, Circuit Judge, concurring specially:

Although I believe that Deputy Rackard's conduct of applying the taser on the third occasion violated the Constitution, nevertheless, I agree with Chief Judge Edmondson that such violation was not clearly established. Accordingly, I agree that we should reverse the district court's denial of summary judgment based on qualified immunity.

MARTIN, District Judge, dissenting:

I respectfully dissent from the judgment in this case. I write to express my view that the Fourth Amendment forbids an officer from discharging repeated bursts of electricity into an already handcuffed misdemeanant—who is sitting still beside a rural road and unwilling to move—simply to goad him into standing up. I also conclude that at the time of the incident, Deputy Rackard was on fair notice that his conduct was unconstitutional. Not only did Deputy Rackard unnecessarily discharge his taser gun against Mr. Buckley three times, but each time he did so, he repeatedly prodded Mr. Buckley's body with the stun gun's live electrodes—inflicting additional pain and leaving Mr. Buckley with sixteen burn scars. Because our law clearly establishes such conduct as unconstitutional, I would affirm the district court's denial of qualified immunity and allow this action to proceed.

## I.

A video captured the events in question, and I suggest it be published together with this opinion. See Scott v. Harris, --- U.S. ----, 127 S. Ct. 1769, 1775 n.5, 167 L. Ed. 2d 686 (2007). Because the factual details are important to the required analysis, I will supplement those included in Chief Judge Edmondson's opinion, stated in a light most favorable to Mr. Buckley.

21

After Deputy Rackard handcuffed Mr. Buckley, he voluntarily got out of his car and walked with Deputy Rackard to the back of the car, but he then collapsed into a sitting position on the grass beside the road. The road was, by Deputy Rackard's description, "desolate"[1] and "out in the middle of no where."[2] There was scant traffic.[3] Mr. Buckley sat motionless with one leg crossed, leaning forward and sobbing.

After observing Mr. Buckley collapse and after attempting to persuade him to stand, Deputy Rackard turned away from Mr. Buckley and walked to his police car to communicate his status over the police radio. For thirty-five seconds, Mr. Buckley sat unattended. When Deputy Rackard returned and first attempted to lift Mr. Buckley, Buckley remained limp. Deputy Rackard partially lifted Mr. Buckley and dragged him several feet away from the road. Mr. Buckley remained limp and uncooperative as he was dropped to the ground. Deputy Rackard again unsuccessfully attempted to persuade Mr. Buckley to stand up, and the following

---

[1] (Appellant's Br. at 6, 25.)

[2] (Appellant's Br. at 20.)

[3] I respectfully disagree with Chief Judge Edmondson's description of the scene of the incident as a "busy road" with "considerable passing traffic." (Op. of Edmondson, C.J., at 8, 11.) In the two minutes that transpired between the time Mr. Buckley collapsed on the ground and the time Officer Rackard discharged the taser the first two times, only two cars drove by. Only three more cars passed by the time Deputy Rackard tased Mr. Buckley the final time, two minutes later.

22

conversation transpired:

> Deputy Rackard:  [I'm] going to tase you.  Do you understand me?
>
> Mr. Buckley:  [Crying] Go ahead.
>
> Deputy Rackard:  Buckley, get up ok?
>
> Mr. Buckley:  [Crying]
>
> Deputy Rackard:  [Places taser on Mr. Buckley's back.]  I'm fixing to tase you.  Get off the ground, ok?
>
> Mr. Buckley:  [Crying] I don't care anymore.  Tase me. [Sound of taser.]

(Buckley Video at 8:01:25.)

As the taser was applied that first time, Mr. Buckley cried out and fell forward from his seated position, with his chest on the ground, his knees bent and his legs folded underneath him.  Mr. Buckley squirmed on the ground in response to the taser, but Deputy Rackard followed Mr. Buckley's movement, attempting to maintain the taser gun's contact with Mr. Buckley's back.  When Deputy Rackard lost contact with Mr. Buckley's body, he immediately replaced the taser on him.  Mr. Buckley unfolded his legs and lurched forward onto the right side of his body.  The clicking of the taser gun continued and Deputy Rackard removed the gun from Mr. Buckley's back, pinned it briefly against his chest, and then returned it to his back.  Deputy Rackard continued holding the taser gun against Mr. Buckley's

23

back until it completed its five-second discharge.[4]

Upon completion of the first discharge, Mr. Buckley laid flat with his chest and face on the ground and his hands still cuffed behind his back, crying. Three seconds passed, and Deputy Rackard ordered Mr. Buckley to stand up, threatening again to shoot him with the taser gun. Though Mr. Buckley had been responsive and defiant before, he did not respond to Deputy Rackard's second warning.

Deputy Rackard again discharged the taser into Mr. Buckley's back, just twenty seconds after he had completed his first five-second discharge. This second tase also lasted five seconds. In response to the taser, Mr. Buckley flipped over onto his back, causing the taser gun to lose contact with his body. Deputy Rackard quickly re-pinned it onto Mr. Buckley's chest, and in response, Mr. Buckley jerked forward. As with the first tase, Deputy Rackard followed Mr. Buckley's movements in attempt to continue the contact between the taser and Mr. Buckley's body. Deputy Rackard replaced the nodes of the taser onto Mr. Buckley's back, lost contact, then lodged the taser gun a final time into Mr. Buckley's back, holding it steady until it completed its discharge.

---

[4] Deputy Rackard testified during an internal investigation that the multiple burns on Mr. Buckley's body were caused by his repeated efforts to replace the taser gun on Mr. Buckley's body during each electric discharge: "[A]s I, uh, administered the taser . . . the subject began to roll in an attempt to get away from it. . . . The taser made multiple contact[s] with him on his upper body region because of the rolling action in his attempt to get away." (Ex. H to Pl.'s Resp. to Defs.' Mot. for Summ. J. at 4 (Statement of Deputy Rackard, Nov. 3, 2006).)

After the second discharge, Deputy Rackard stood up silently, turned away from Mr. Buckley, and returned to his police vehicle, leaving Mr. Buckley unattended on the side of the road for the second time. He returned approximately thirty seconds later and again ordered Mr. Buckley to stand up. Mr. Buckley sat cross-legged, leaning forward and still crying. He offered no response to Deputy Rackard. After again attempting to lift Mr. Buckley, Deputy Rackard pressed the taser gun against Buckley's back, warned Buckley, and discharged it a third time.

The final discharge caused Mr. Buckley again to lurch forward onto his side. As Deputy Rackard had before, he followed the movement of Mr. Buckley's body with the taser gun. He lost contact with Mr. Buckley's body at least four times, and each time re-pinned the taser against Mr. Buckley onto different areas of Mr. Buckley's chest and back.

After the final discharge, Deputy Rackard left Mr. Buckley for the third time and returned to his police car. He announced over the radio that the "subject's in custody; not wanting—refusing to come to the car." He approached Mr. Buckley briefly and again returned to his patrol car, leaving Mr. Buckley unattended for the fourth time during the encounter. Less than three minutes later—and five minutes from the time Deputy Rackard first tased Mr. Buckley—a second officer arrived on the scene. The two officers easily lifted Mr. Buckley off the ground and

escorted him away. This action followed.

## II.

The first question, as instructed by <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), is whether Deputy Rackard used excessive force. This is not a case about whether an officer may use a taser gun to subdue an unruly or dangerous individual. See <u>Zivojinovich v. Barner</u>, 525 F.3d 1059, 1073 (11th Cir. 2008) ("[I]n a difficult, tense and uncertain situation the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force.") (citation and internal quotations omitted); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 (11th Cir. 2004) (same). Rather, the question in the case is whether a taser gun may be used repeatedly against a peaceful individual as a pain-compliance device—that is, as an electric prod—to force him to comply with an order to move. Accord <u>Hickey v. Reeder</u>, 12 F.3d 754, 757-58 (8th Cir. 1993) (holding single use of stun gun against prisoner to compel compliance with order to sweep cell was excessive under the Eighth Amendment as a matter of law).

Like the district court below, I conclude that the repeated and sustained use of the taser gun for the sole purpose of coercing Mr. Buckley to move was unreasonable under the circumstances and thus violated the Fourth Amendment.

26

## A.

The Fourth Amendment affords a police officer "the right to use some degree of physical coercion" in effecting an arrest, <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), but the use of force must be "reasonably proportionate to the need for force." <u>Zivojinovich</u>, 525 F.3d at 1073. "'[D]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir. 2002) (quoting <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1197 (11th Cir. 2002)). In conducting the objective inquiry under the Fourth Amendment, the Supreme Court has instructed us to give "careful attention" to three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is *actively* resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396 (emphasis added).

**B.**

I begin by observing that all three Graham factors weigh strongly in Mr. Buckley's favor.

First, the crimes for which Mr. Buckley was arrested—failure to sign a traffic citation and resisting arrest without violence—were non-violent misdemeanors. As such, Mr. Buckley's crimes were of "'minor severity' for which less force is generally appropriate." Reese v. Herbert, 527 F.3d 1253, 1274 (11th Cir. 2008) (quoting Vinyard, 311 F.3d at 1348-49).

Second, Mr. Buckley did not present an immediate threat to Deputy Rackard or others. The video demonstrates that once he was handcuffed, Mr. Buckley voluntarily got out of his car, walked part of the way to the patrol car, then collapsed on the ground in a seated position. He sat still and cross-legged, with his hands cuffed behind his back. Mr. Buckley's only movements after he collapsed on the ground were in response to each discharge of the taser gun. After each discharge was complete, Mr. Buckley sat or laid still, crying, and unwilling or unable to stand.[5] The video demonstrates that as Mr. Buckley

---

[5] Although Chief Judge Edmondson suggests that Mr. Buckley "could both run and kick" because his legs were not restrained and "was moving around on the ground alongside a busy road" (Op. of Edmondson, C.J., at 11), the video illustrates that Mr. Buckley was in no condition to run, never kicked, and moved only when his body was tased.

28

responded to the taser, he moved away from the highway, not closer to it. At no time were Deputy Rackard or Mr. Buckley closer to the highway than they had been when Deputy Rackard first stopped the car.

Finally, Mr. Buckley did not *actively* resist arrest or attempt to flee. Rather, the video shows an emotionally overwrought individual, through sobs, *passively* refusing, if not unable, to comply with Deputy Rackard's directive to pull himself up from the ground.

Deputy Rackard's own behavior during the encounter, as seen on the video, further evidences that Mr. Buckley posed no danger or risk of flight. In the six-minute period that transpired after Mr. Buckley was handcuffed and on the ground, Deputy Rackard turned away from him and returned to his patrol car on *four* separate occasions, leaving Mr. Buckley unattended for substantial periods of time.[6] During the encounter, Deputy Rackard also advised over the radio that Mr. Buckley was "in custody." Based on these circumstances, neither Deputy Rackard nor any reasonable officer on the scene could have concluded that Mr. Buckley

---

[6] Deputy Rackard strains to make the argument that Mr. Buckley "actively" resisted arrest, but he states that "the form the active resistence took was essentially gravitational," and Mr. Buckley's conduct amounted to a "roadside sit down strike." (Appellant's Br. at 23-24.) There would have been little reason for the Supreme Court to use the adverb "actively" if its conception of "active resistance" included resistance by *inaction*—that is, by a fully limp arrestee who refuses an order to stand. See Graham, 490 U.S. at 396.

29

was actively resisting arrest or attempting to flee.[7]

## C.

Although the Eleventh Circuit has not spoken in terms of "pain compliance," at the very least, the Fourth Amendment prohibits the infliction of gratuitous pain and injury as a means to coerce compliance. E.g., Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 118, 123-24 (2d Cir. 2004) (concluding that protesters who employed "passive resistance" techniques including going limp stated Fourth Amendment violation against officers who used pain compliance techniques, including choke holds and wrist-bending, because jury could conclude that "the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances"); Headwaters Forest Def. v. County of Humboldt, 276 F.3d 1125, 1128-30 (9th Cir. 2002); Forrester v. City of San Diego, 25 F.3d 804 (9th Cir. 1994);[8] cf. Asociacion de Periodistas de Puerto Rico v. Mueller, 529

---

[7] In his testimony, Deputy Rackard appears to recognize that Mr. Buckley did not present a danger or a risk of flight. He testified during an internal investigation that he chose to switch the taser gun to stun-gun mode, as opposed to electric-dart mode, because the "threat of physical violence to myself was minimized, uh, and I felt that at the time a touch tase would be more appropriate given the subject was handcuffed and on the ground." (Ex. H to Pl.'s Resp. to Defs.' Mot. for Summ. J. at 3 (Statement of Deputy Rackard, Nov. 3, 2006).)

[8] Chief Judge Edmondson cites Forrester in support of the proposition that pain may be inflicted on a passively resisting arrestee to coerce compliance. Forrester, however, simply upheld a jury's conclusion that officers did not use excessive force when they used painful wrist grips, wrist- and arm-twisting, and pressure point holds to move unwilling protesters arrested at a medical building. 25 F.3d at 807-08.
    In upholding the jury verdict in favor of the City of San Diego, the Ninth Circuit

F.3d 52, 60 (1st Cir. 2008) (concluding that "mere obstinance by a crowd, without any evidence of a potential public safety threat or other law enforcement consideration," did not justify use of batons and pepper spray). A taser functions by sending an "electric pulse through the body of the victim causing immobilization, disorientation, loss of balance, and weakness." Matta-Ballesteros v. Henman, 896 F.2d 255, 256 n.2 (7th Cir. 1990). When used successfully, a taser renders an individual incapacitated, disoriented, and *unable* to move. Hickey, 12 F.3d at 757 (noting that when used effectively, a stun gun "temporarily incapacitate[s] a threatening person, [giving] the officers involved momentary advantage and a chance to neutralize the threat"). Thus, by its design, a taser is particularly unsuited as a pain-compliance device.

Perhaps for this reason the Washington County Sheriff's Office did not authorize Deputy Rackard to use it in such a manner.[9] Each five-second discharge

emphasized that the nature of the force was "less significant than most claims of force" and the state interest in maintaining order was high in light of the presence of more than 100 protesters "operating in an organized and concerted effort to invade private property, obstruct business, and hinder law enforcement." Id. at 807. The court also noted that "the officers used minimal and controlled force in a manner designed to limit injuries to all involved." Id. at 808. The restraint device used by the officers in Forrester was described by the court as producing discomfort that was "gradual in nature," and the court contrasted it with use of force "which would create immediate and searing pain." Id. at 808 n.5. The use of the taser by Deputy Rackard produced pain that was neither limited nor gradual.

[9] The Washington County Sheriff's Office Policy and Procedures Manual provides only that the taser

31

in fact frustrated Deputy Rackard's efforts in getting Mr. Buckley to stand and walk to the police car.[10]  Cf. Headwaters Forest, 276 F.3d at 1130 (stating that it was "even *less* necessary to *repeatedly* use pepper spray against the protesters when they refused to release").

**D**.

Balancing the individual interests at stake against the need for force, the repeated use of the taser gun against Mr. Buckley was a wholly disproportionate response to the need to remove Mr. Buckley from the roadside and transport him to the police station.

First, Deputy Rackard's use of force caused gratuitous pain and injury. Deputy Rackard used the taser gun against Mr. Buckley three times and applied the full force of each five-second discharge.  As Mr. Buckley moved in response to each shocking, Deputy Rackard followed his movements, repeatedly re-pinning

---

may be used to control a dangerous or violent subject when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been, or likely will be, ineffective in the situation at hand; or there is reasonable expectation that it will be unsafe for officers to approach within contact range of the subject.

(Ex. E to Pl.'s Resp. to Defs.' Mot. for Summ. J., Washington County Sheriff's Office Policy and Procedures Manual, No. 330, at 1.)

[10] Mr. Buckley states that Deputy Rackard's repeated jabs with the taser gun "ma[de] it harder for me to follow his commands.  Without the use of the Taser by Deputy Rackard, I could have recovered my composure and followed the officer's commands sooner than I did." (Buckley Aff. ¶ 5, Feb. 7, 2007, Ex. A to Pl.'s Resp. to Defs.' Mot. for Summ. J.)

the taser gun onto different areas of Mr. Buckley's body, maximizing pain and injury. The taser gun caused immediate pain and was not applied gradually. Mr. Buckley described the pain as "tremendous" and "intense."[11] Deputy Rackard's repeated prods caused Mr. Buckley sixteen burn scars, which evidence the level of pain he experienced. Although it is difficult to see how even a single, brief electric discharge could have been reasonable under these circumstances, see Hickey, 12 F.3d at 757-58, there can be little doubt that the continuous and repeated manner in which Deputy Rackard discharged the taser gun was grossly disproportionate to the need to move Mr. Buckley from the side of the road.

Second, as discussed above, Deputy Rackard's use of the taser gun did little to further the state interest in completing the arrest. Given the disabling effects of a tase, it is not surprising that Mr. Buckley did not respond to Deputy Rackard's orders and warnings any time after Deputy Rackard first discharged the taser gun.[12] Viewing the evidence in a light most favorable to Mr. Buckley, each five-second discharge frustrated Mr. Buckley's ability to comply with Deputy

---

[11] (Buckley Aff. ¶¶ 5, 8, Feb. 7, 2007, Ex. A to Pl.'s Resp. to Defs.' Mot. for Summ. J.)

[12] Although Chief Judge Edmondson also relies on Deputy Rackard's pre-tase warnings in support of his conclusions, a warning cannot immunize otherwise excessive force from constitutional scrutiny. See Headwaters Forest, 276 F.3d at 1128-30 (holding repeated use of pepper spray against passively resisting protesters unconstitutional despite fact that officers warned plaintiffs before each discharge).

33

Rackard's order to stand and further reduced the need for force. It was thus unreasonable for Deputy Rackard to discharge the taser gun against Mr. Buckley a second time within only twenty seconds of the first discharge, when Mr. Buckley had not had sufficient time to regain his composure. And the lack of effectiveness of the first two discharges rendered the final discharge—inflicted after Deputy Rackard had called for backup—wholly unnecessary and cruel. Because Deputy Rackard's repeated use of the taser was "not a good faith effort to restore discipline," see Orem v. Rephann, 523 F.3d 442, 447 (4th Cir. 2008), and resembled more an "exaggerated response to [Mr. Buckley's] misconduct and a summary corporal punishment," Hickey, 12 F.3d at 759, it was not reasonable under the Fourth Amendment.

Finally, reasonable alternatives existed to move Mr. Buckley. Besides any number of less injurious, more effective and safer forms of pain-compliance techniques, Deputy Rackard had the option of calling for assistance. Indeed, pursuant to the policy of his police department, Deputy Rackard was required to do so upon discharging the taser gun.[13] Deputy Rackard has introduced no

---

[13] The Washington County Sheriff's Office Policy and Procedures Manual provides:

1.      Officers deployed with an AIR TASER shall:
      a.      Upon encountering a situation, which may require the use of an AIR TASER, request the response of a back-up and a supervisor with an AIR TASER unit (**CODE ZEBRA**)

34

evidence that summoning the assistance of a backup police officer was burdensome at the time of the incident. The video demonstrates that backup arrived within five minutes of his request. Accord Headwaters Forest, 276 F.3d at 1128-30 (noting that officers could have moved protesters and removed lock-down devices "in a matter of minutes without causing pain or injury"). Under these circumstances, it was unreasonable for Deputy Rackard to repeatedly shock Mr. Buckley with the taser gun.

## E.

Chief Judge Edmondson emphasizes the state interest in roadside safety and efficiency in single-officer arrests in concluding that Deputy Rackard's use of force was constitutionally reasonable. However, the individual interests protected by the Fourth Amendment do not so easily give way. Many police encounters occur on the roadside at night, and each carries risks that could theoretically be reduced if police officers were authorized to inflict pain as a way to expedite their law-enforcement efforts. In this case, those risks were at a minimum, however, because traffic was scarce and Mr. Buckley and Deputy Rackard remained a good

---

b.    When practical, don't escalate the situation prior to the arrival of a
back up officer and equipped supervisor.

(Ex. E to Pl.'s Resp. to Defs.' Mot. for Summ. J., Washington County Sheriff's Office Policy and Procedures Manual, No. 330, at 3, Section 2.E.1. ("Field Officer Responsibilities").)

35

distance from the road.

Neither did Deputy Rackard's repeated use of a taser gun against Mr. Buckley conserve resources. Mr. Buckley was easily moved from the side of the road to the patrol car by two officers. The Washington County Sheriff enacted a policy generally requiring the presence of a second office once a taser had been discharged. Thus Deputy Rackard did nothing to avoid the necessity for the involvement of other officers by applying the taser gun to Mr. Buckley, because backup was thereby required and, in any event, was already en route.

**F.**

In sum, I conclude that no reasonable officer could have believed that the force used by Deputy Rackard was necessary in response to the situation at hand. Lee, 284 F.3d at 1197. Accordingly, under the first prong of Saucier, I would hold that Mr. Buckley has brought forth sufficient evidence to state a Fourth Amendment violation against Deputy Rackard.

**III.**

I would also find, under the second prong of Saucier, that the law was clearly established at the time of the incident that Deputy Rackard's conduct was unconstitutional. Whatever the debatability of employing a single, controlled electric shock against a non-compliant individual to coerce him into movement, in

this case Deputy Rackard repeatedly prodded Mr. Buckley's body which maximized the level of pain he experienced. In light of the repeated and continuous nature of the force used against Mr. Buckley, the substantial pain and bodily injury that resulted, and the absence of any arguable justification, I have no difficulty in concluding that no particularized preexisting case law was necessary for it to be clearly established that Deputy Rackard's conduct was unconstitutional. Deputy Rackard's use of force was so grossly disproportionate to the need for force that no reasonable officer would have believed such conduct was legal. See Lee, 284 F.3d at 1198-99 (holding that qualified immunity should be denied where an officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law") (citation and internal quotations omitted); Hope v. Pelzer, 536 U.S. 730, 745, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002) (denying qualified immunity for "obvious cruelty" despite lack of factually similar prior precedent); Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) ("'It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books.'") (quoting McDonald v. Haskins, 966 F.2d 292, 295 (7th Cir.

37

1992)).

Accordingly, I would affirm the district court's denial of qualified immunity.